IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
LUFKIN DIVISION

| | |
|---|---|
| CALVASHA SUMMERS, <br><br> Plaintiff, <br><br> v. <br><br> LYNN P. TORRES, SUPERINTENDENT, and LUFKIN INDEPENDENT SCHOOL DISTRICT, <br><br> Defendants. | NO. 9:22-CV-00029-MJT-ZJH |

**REPORT AND RECOMMENDATION GRANTING DEFENDANTS' MOTION TO DISMISS AND DENYING AS MOOT DEFENDANTS' MOTION TO COMPEL DISCOVERY**

This case is assigned to the Honorable Michael J. Truncale, United States District Judge. On December 30, 2022, Judge Truncale referred Defendants Lynn P. Torres and Lufkin Independent School District's ("LISD") (collectively, "Defendants") pending *Motion to Dismiss Plaintiff's First Amended Complaint* ("Motion to Dismiss" or "Motion") (Doc. No. 17) to the undersigned United States Magistrate Judge for consideration and disposition. Doc. No. 36. On February 16, 2023, Judge Truncale also referred Defendants' pending *Motion to Compel Discovery from Plaintiff* ("Motion to Compel") (Doc. No. 37). Doc. No. 39.

The undersigned begins this report by noting that Plaintiff Calvasha Summers's *First Amended Complaint* (Doc. No. 13) is riddled with pleading deficiencies, and difficult to decipher in multiple places. From what the undersigned *can* understand from Summers's operative complaint, the undersigned recommends that Summers lacks Article III and prudential standing to continue prosecuting some of her claims, and granting Defendant's instant *Motion* because Summers's employment discrimination and Section 1983 claims fail to pass muster under *Iqbal* and *Twombly*.

Accordingly, Defendants' *Motion to Dismiss* (Doc. No. 17) should be granted, and Defendants

*Motion to Compel Discovery from Plaintiff* (Doc. No. 37) should be denied as moot.

## I.    Factual and Procedural History

Plaintiff Calvasha Summers is an African-American woman who has worked as a guidance

counselor at Lufkin High School ("LHS"), within the Lufkin Independent School District ("LISD"

or "the District"), since 2017.  First Am. Compl., Doc. No. 13 at 4, 7–8, ¶¶ 12, 17.

### A.  The "Soul to Soul" Gala

The events underlying this lawsuit begin in January 2019, during a gala for an LHS

African-American success initiative, known as "Think Tank."  *Id.* at 9–11, ¶¶ 18–24.  Think Tank

was an LISD initiative for African-American LISD students, as a way to incorporate "community

and parent involvement" with the District.  *Id.* at 9, ¶ 18.  Each year, Think Tank hosted a gala

called "Soul to Soul" ("STS"), where LISD students, parents, and other allied members of the

Lufkin community, held an awards ceremony for high-achieving African-American students.  *Id.*

At the January 2019 STS gala, an African-American male staff member served as the

"master of ceremonies" ("master").  *Id.* at 11, ¶ 24.  Part of the master's duties during the gala

included introducing LISD's new Superintendent Lynn Torres to audience members at the STS

gala.  *Id.*  When the master asked Torres to speak to the audience, however, she allegedly refused.[1]

*Id.* at 11–12, ¶ 24.  On February 4, 2019, Torres held a Think Tank meeting with STS staff and

---

[1] Here, the parties dispute whether Superintendent Torres actually refused to speak to audience members at the STS gala.  *See* Defs.' Mot., Doc. No. 17 at 6 (citing website link with photographs of STS gala) ("[O]ne need look no further than the District's website to find dozens of pictures of Superintendent Torres proudly greeting and congratulating every single student as they crossed the stage.").

The court, however, will not entertain Defendants' representation of facts, nor attached website link, for on a motion to dismiss, the court must presume all facts pleaded in the plaintiff's complaint are true.  *Vardeman v. City of Hous.*, 55 F.4th 1045, 1050 (5th Cir. 2022) (internal citations and quotation marks omitted) ("The court accepts well-pled facts as true and views them in the light most favorable to the plaintiff . . . [a]ll questions of fact . . . must be resolved in the plaintiff's favor.").  Accordingly, for the purposes of the instant motion, the court will presume that Superintendent Torres refused to speak to audience members at the STS gala.

parents to hold a constructive conversation regarding the success of the January STS gala.  *Id.* at 12, ¶ 25.  During this meeting, a parent of an LISD student voiced their concern regarding Torres's alleged failure to participate during the event, and asked why she did not address the attendees nor congratulate STS students.  *Id.* at 12–13, ¶ 30.  Torres allegedly "did not react," and the meeting concluded with all members planning to hold a second gala in March 2019.  *Id.* at 13, ¶ 31.

Three days after the Think Tank meeting, however, Torres sent an email correspondence to all STS committee members, including Summers, stating that Torres would terminate the Think Tank, in part, because "Summers has asked to step down from chairing the Soul[-]to[-]Soul event."[2]  *Id.* at 13–14; Ex. 1, Doc. No. 13-2.[3]  In its place, Torres noted that LISD would continue hosting future initiatives for African-American students, and attached a shared document for all members to post ideas to replace STS.  Doc. No. 13 at 14; Ex. 1, Doc. No. 13-2.

On February 14, 2019, Assistant Superintendent Kurt Stephens summoned Summers to a meeting, where Stephens informed Summers that Superintendent Torres "felt [Summers] had ambushed Torres at the [gala] and prompted [the STS parent] to ask [ ] questions of Torres."  *Id.* at 14, ¶ 36.  According to Stephens and Torres, Summers allegedly set up this "ambush" by "intentionally inviting parents to 'roast' Torres."  *Id.* at 14–15, ¶¶ 36–37.  As such, Stephens repeatedly requested Summers schedule a meeting with Torres to apologize, to which Summers refused.  *Id.* at 15–16, ¶¶ 39–41.  Soon afterward, Stephens purportedly requested that LHS Principal Brendan Boyd summon Summers to Boyd's office to meet with Stephens privately.  *Id.*

---

[2] Summers repeatedly contests that she "had NOT resigned or said anything about resigning."  Doc. No. 13 at 14, ¶ 34 (emphasis in original).

[3] When resolving a motion to dismiss, the court "is confined to a limited factual universe: '(1) the facts set forth in the complaint, (2) documents attached to the complaint, and (3) matters of which judicial notice may be taken under Federal Rule of Evidence 201.'"  *Hernandez v. El Pasoans Fighting Hunger*, No. 22-50240, 2022 WL 18019437, at *4 (5th Cir. Dec. 30, 2022) (per curiam) (quoting *Walker v. Beaumont Indep. Sch. Dist.*, 938 F.3d 724, 735 (5th Cir. 2019)).  As such, the undersigned will incorporate Summers's attached exhibits in this report's recitation of the facts.

at 16, ¶ 42.  Once again, Stephens asked Summers to apologize to Superintendent Torres.  *Id.*, ¶ 43.

Each time Stephens requested Summers apologize, he mentioned that apologizing to Torres would

ensure that her relations with LISD would remain "un-strained."  *Id.* at 15–16, ¶¶ 40–43.  And,

each time, Summers refused to apologize for having done nothing wrong.  *Id.* at 16, ¶ 44.[4]

    B.  <u>Alleged Discrimination and Reprisal Following the Soul-to-Soul Gala</u>

       In the wake of the STS gala and Stephens's requests of Summers to apologize, Stephens

allegedly admitted that "he had put [Summers] in a worse position" because he told Summers how

Torres felt, but Summers refused to apologize.  Doc. No. 13 at 16, ¶ 45.  Summers alleges the

following events demonstrate that Defendants have discriminated and retaliated against her, in

violation of Chapter 21 of the Texas Labor Code and Title 28 U.S.C. § 1983.

       *i.*   *Denied Conference Requests*

       In September 2019, Summers requested permission to attend a conference in Irving, Texas.

Doc. No. 13 at 17, ¶ 46.  In October 2019, LISD informed Summers that it would send one staff

member to a conference.[5]  *Id.* at 18, ¶ 50.  Summers asked her campus principal Brandon Boyd if

LISD had any funds to cover the costs of the conference so that she may attend.  *Id.*  Boyd replied

to Summers in an email denying her request, stating that the school does not set aside money for

any training or staff development unless that department submits a budget request in the spring of

the previous school year.  *Id.* at 19, ¶ 54.  Summers therefore paid for the conference out of her

---

[4] On February 26, 2019, Summers sent an email to Superintendent Torres requesting to meet with her.  Ex. 5, Doc. No. 13-2 at 11.  In her internal grievances with the school board, Summers represented that Torres failed to respond.  Ex. 20, Doc. No. 13-2 at 30 ("I did reach out [to Torres].  She did not respond and has not spoken to me since the night she made the assumptions.").

[5] It is unclear whether the October 2019 conference is the same Irving conference that Summers previously referenced.  Indeed, the rest of Summers's *Complaint* is devoid of any further mention of the Irving conference.  If the October 2019 conference is a separate conference, Summers's has failed her burden in pleading so.  The court will therefore presume that this October 2019 conference refers to Summers's September 2019 request to attend the Irving conference.

own pocket, even though LISD allegedly paid for its technology team, consisting of all white staff members and students, to attend an annual conference in Galveston.  *Id.*, ¶¶ 55, 56.

### ii.    *"Empower" School Club*

In October 2019, Summers and two other African-American educators filled out an application to start a diverse club for female students at LHS, called "Empower."  *Id.* at 17, ¶ 47. In what Summers deems "unusual," LISD required Summers and the sponsoring staff members to present data and meet with campus administration regarding why LHS needed this club.  *Id.* Eventually, LISD approved of "Empower."  *Id.*, ¶ 48.

Later that same month, "Empower" reached out to obtain media coverage from the local media outlet "KTRE" to report a story about the club.  *Id.* at 18, ¶ 49.  However, a KTRE reporter informed Summers that Superintendent Torres's Public Relations staff member, Sheila Adams, ordered KTRE to "hold off" on the story because "Empower" was not yet an official LISD club. *Id.* In December 2020, Sheila Adams ignored "Empower's" request to place notice of their fundraiser in the LHS newsletter.  *Id.* at 24, ¶ 75.

### iii.    *Denied Promotions*

In July 2020, LISD hired a white former counselor, Brandie Knight, as LISD's "Success Coach"—a new position in the District that had not been posted online or otherwise for other staff members to apply.  *Id.* at 19–20, ¶¶ 59–60.  When Summers asked why the position was not posted, Torres explained that the "Success Coach" position was a lateral move and not a promotion.[6]  *Id.* at 20, ¶ 62.

---

[6] Here too, the parties dispute whether Torres provided Summers with the explanation for hiring Knight, or whether it was Associate Principal Julie McManus.  *See* Defs.' Mot., Doc. No. 17 at 6 n.5 (citing Ex. 34, First Am. Compl., Doc. No. 13-3 at 58).  In support of their factual disagreement, Defendants cite to Exhibit C attached to Summers's *First Amended Complaint*, which is Summers's own Level Two internal grievance. Ex. 34, Doc. No. 13-3. In her Level Two grievance, Summers states that Associate Principal Julie McManus made the hiring decision and provided her with the explanation.  *Id.* at 58.

Also in July 2020, Summers applied for the position of "Director of Counseling," along with her "Hispanic White" coworker, Gabriela Murphy.[7] *Id.* at 21, ¶¶ 65, 66.  Historically, this position required administrative certification, which Summers has accomplished, while allegedly, Murphy has not.  *Id.*, ¶¶ 64, 67.  During this July 2020 round of applications, however, LISD dispensed with its previous certification requirement, and hired Murphy for the position.  *Id.*, ¶ 67.

Next, in January 2021, Summers applied for the position of "go-center advisor."  *Id.* at 25, ¶ 77.  The interview panel for this position consisted of one white man who was allegedly not employed by LISD, and no black administrators were on the panel.  *Id.*  In the end, LISD did not offer Summers the position, but instead, hired a person with purportedly less experience and qualifications.

---

While it is true that "[w]here the allegations in the complaint are contradicted by facts established by documents attached as exhibits to the complaint, the court may properly disregard the allegations," Summers's attached grievance to her *Complaint* does not present an adequate circumstance to disregard the allegations set forth in her *Complaint*. *Darnell v. Sabo*, No. 4:19-cv-871-O, 2022 WL 16577866, at *4 (N.D. Tex. Nov. 1, 2022) (citation omitted).  For example, in *Nishimatsu*, on a motion to dismiss posture, the Fifth Circuit gave greater weight to an attached contract between the parties, rather than the pleadings.  *See Nishimatsu Constr. Co. v. Hous. Nat'l Bank*, 515 F.2d 1200, 1204, 1206 (5th Cir. 1975) (citations omitted) ("The appellee's general averment that Secon and Baize entered into a contract and that they are liable on that contract, is contradicted and controlled by the contract showing that Baize signed only as an agent.").

The present case, however, does not establish such undisputed *facts*, such as the contents of a contract, but rather only mere factual allegations.  Indeed, there is a discrepancy between what Summers stated in her Level Two internal grievance, and what she has stated in her operative *Complaint*—almost all of which, is a replica of her internal grievances filed with the school board.  Nonetheless, the court will not disregard Summers's allegations in favor of her attached grievance, as this is clearly a question of fact, and when resolving a motion to dismiss, all questions of fact must be resolved in the plaintiff's favor.  *Vardeman*, 55 F.4th at 1050 (internal citations and quotation marks omitted) ("The court accepts well-pled facts as true and views them in the light most favorable to the plaintiff . . . [a]ll questions of fact . . . must be resolved in the plaintiff's favor.").  Accordingly, for the purposes of resolving the instant motion, the undersigned will presume that Superintendent Torres provided Summers with an explanation regarding why the position was not posted.

[7] The undersigned understands this racial/ethnic designation to mean that Murphy is Hispanic, but perhaps is white-appearing.  Regardless, the court will treat Murphy as "Hispanic" for the purposes of analyzing this employment action.

### iv.    Extra Duties Stipend

In March 2021, Summers complains that LISD told her she would receive a stipend to take on extra duties.  *Id.* at 25, ¶ 78.  Summers signed a contract but did not receive her stipend until the following school year.  *Id.*

### C.    Internal Grievances

On July 22, 2020, Summers filed her first internal grievance with the LISD school board.  Doc. No. 13 at 24, ¶ 74.  Summers therefore complains about the following events that took place after she filed her grievance.[8]

### i.    Performance Evaluations

Next, Summers complains about her performance evaluation for the 2020–21 school year.  Doc. No. 13 at 8, ¶ 17(c)(iii), 25 ¶¶ 17(c)(ii)–(v), 79.  For each school year from 2017 until 2020, Summers received a "perfect 4 or Exceeds Performance" evaluation.  *Id.*, ¶ 17(c)(ii).  However, during the 2020–21 school year, Summers received a "3," which signifies a "merely Proficient" evaluation.  *Id.*, ¶ 17(c)(iii).  On September 7, 2021, Gabriela Murphy sent a letter to Summers, serving as "written proof" that Murphy changed Summers's evaluation from a "3" to a "4" for a certain sub-section of her evaluation.  Ex. 11, Doc. No. 13-2 at 21.[9]

Moreover, Summers complains that during the 2021–22 school year, Summers received notice that her evaluation "was suddenly revised on May 25, 2022, upward to a perfect 4 or Exceeds Expectation," which Summers surmises to mean that she originally received a "3" and

---

[8] Here, Summers failed to state whether she believes LISD and/or Torres took these "actions" in retaliation for her internal grievance.  Summers's *Complaint* only alleges that LISD retaliated against her by lowering her performance evaluation for the 2020–21 school year, *see infra* Section I(c)(i).  First Am. Compl., Doc. No. 13 at 8–9, ¶ 17(c)(v) ("The clear reason for the lower evaluation score for the Anomaly Year, was the grievance Plaintiff had filed last on July 22, 2020 against Defendant Torres . . .").  However, as these events transpired following Summers's internal grievance, the court will analyze them as allegations of retaliation, in addition to the events following the STS gala.  *See infra* Section III.

[9] It is unclear whether Summers complains about only the sub-section Murphy changed as indicated in her letter, or if Summers complains about her entire 2020–21 evaluation.

LISD then revised it to a score of "4".  Doc. No. 13, ¶ 17(c)(iv).  Summers further alleges that she received an initially "scored down" evaluation because of her July 22, 2020 grievance.  *Id.*, ¶ 17(c)(v)

Lastly, in September 2021, Counseling Supervisory Gabriela Murphy asked Summers to sign an allegedly false statement regarding her evaluation.  *Id.* at 26, ¶ 82.  Summers declined.  *Id.*

### ii.    *"Empower" School Club*

Between May and June 2021, "Empower" requested to attend an educational trip to Atlanta, Georgia, however Principal Boyd declined this request due to insufficient funding.  *Id.* at 25–26, ¶ 80.  Summers alleges that she proved to Principal Boyd that the club had the required funding, but Boyd nonetheless denied Empower's request.  *Id.* at 26, ¶ 81.

### iii.    *Summers's Work Attire*

Next, in January 2022, Summers complains that District Assessment Coordinator Carolyn Beavers contacted Gabriela Murphy to criticize Summers's attire.  Summers apparently wore a black beanie, and Gabriela Murphy "brusquely [told] [Summers] to 'remove the hat.'"  *Id.* at 26, ¶ 85.

### iv.    *False Communications with Parent*

Summers next contends that in January 2022, administration called Summers's principal, then Andre Emmons, and "falsely stated" that Summers told an LHS parent that "the only way to get things done is to go to the school board."  *Id.* at 27, ¶ 86.

### v.    *Education Conference*

On January 5, 2022, Gabriela Murphy presented all LHS counselors with the option to attend a conference in New York City or Las Vegas.  *Id.* at 27, ¶ 87.  Summers immediately requested to attend the conference in New York, as it better fit her schedule, however, on January

19, 2022, Summers received notice that the New York conference had been canceled for not enough interest.  *Id.*, ¶ 88.  On January 25, 2022, Murphy allegedly stated that the New York conference was not canceled due to lack of interest, but because of the amount of school days that would be missed, however, Summers alleges that this was the same amount of school days missed for a different conference in Round Rock, Texas.  *Id.* at 28, ¶ 91.

### vi.    Denied Promotions

On February 28, 2022, Summers applied for a new position as the Parent Activity Center Facility Coordinator.  *Id.* at 28, ¶ 92.  Summers placed her name in the pool of interested applicants based on the assumption that this position was an "add-on/extra duties/stipend compensated" position.  *Id.*, ¶ 93.  To ensure that this was not a full-time position, Summers emailed the Director of Human Relations ("HR Director") asking whether this was a part-time, "extra duties" position, and requested the HR Director to remove her name from the application pool if it was indeed a full-time position.  *Id.* at 28–29, ¶ 94.  The HR Director responded that the Facility Coordinator position was a full-time position, and instructed Summers how she may remove her application online.  *Id.* at 29, ¶ 95.[10]

On March 28, 2022, Summers learned that a white, full-time employee—the husband of Julie McManus—accepted the Facility Coordinator position.  *Id.* at 29, ¶ 97.  On March 30, 2022, Summers sent an email to Human Resources again asking if this position was a part-time, "extra duties" stipend position.  *Id.* at 31, ¶ 104.  Human Resources failed to respond to her email.  *Id.*, ¶ 105.

On April 1, 2022, Summers sent a Texas Public Information Act ("TPIA") request to Human Resources asking this same question.  *Id.*, ¶ 106.  On April 18, 2022, LISD attorney Wayne

---

[10] Summers failed to mention whether she ever followed these steps to remove her application from the application pool.

Haglund responded to Summers's TPIA request "ducking her question and not responding to [her] email." *Id.*, ¶ 107 (emphasis omitted).  Summers contends that this position was a part-time, "add-on" position, and that LISD lied to her so that she would remove her application. *Id.*, ¶ 108.

### vii.    *Fundraiser Flier*

On March 25, 2022, Summers asked Public Relations Director Sheila Adams to share a flier regarding a school club fundraiser in the LISD newsletter.[11] *Id.* at 29, ¶ 96.  On March 28, 2022, Adams responded to Summers that she could only post news regarding the fundraiser if it was for an LHS club fundraiser, and that this club was not registered as such. *Id.* at 30, ¶ 99. Summers responded with other outside community organizations that have had their fundraisers shared in the District newsletter, and on March 29, 2022, LISD posted Summers's requested flier in its newsletter. *Id.*, ¶¶ 100–01.

### D.    Procedural History

### i.    *Internal Grievances*

On July 22, 2020, Summers filed her Level I internal grievance. Doc. No. 13 at 2, ¶ 7.  On August 12, 2020, Summers and her representative, Reverend Sylvester McClain, Assistant Superintendent Kurt Stephens, LHS Principal Brandon Boyd, LISD attorney Wayne Haglund, and Executive Director of Student Services and Summers's Level I Conference Officer, Deidra Harrison, all met for Summers's Level I Conference at the LISD Administration Building. Ex. 34, Doc. No. 13-3 at 50.  The parties held a conference to discuss Summers's complaints regarding LHS's failure to hire her for the Director of Counseling position. *Id.* at 51.  On August 26, 2020, Harrison sent Summers and McClain a letter denying her grievance at the Level I stage. *Id.* at 50–53.  This letter explained that LHS hired Gabriela Murphy for the position due to her

---

[11] Summers's operative *Complaint* does not state the context nor contents regarding this fundraiser, such as whether it was on behalf of the previously-mentioned group "Empower," or a different school club.

twenty-two (22) years of total experience, compared to Summers's thirteen (13) years of total experience, and Murphy's thirteen (13) years of experience as a counselor, compared to Summers's three (3) years of experience as a counselor. *Id.* at 51. Additionally, Murphy is fluent in Spanish, which was "a significant objective consideration given the rapidly increasing number and percentage of Hispanic students at [LHS]." *Id.* Moreover, Summers complained about the racial composition of the hiring committee, which was composed of three (3) white administrators, one (1) Hispanic administrator, and one (1) African-American teacher. *Id.* at 52. Ultimately, Harrison dismissed all other matters in Summers's Level I complaint as "outside the scope of [her] original Level I complaint and/or barred as untimely." *Id.* at 53.

On September 8, 2020, Summers filed her Level II Appeal Notice.[12] Ex. 34, Doc. No. 13-3 at 54. On October 15, 2020, Assistant Superintendent Shelly Slaton presided over Summers's Level II Conference, with Summers, Reverend McClain, Assistant Superintendent Kurt Stephens, Level I Conference Officer Deidra Harrison, and LISD attorney Wayne Haglund present. Ex. 28, Doc. No. 13-3 at 10. At the hearing, Harrison explained that a racially diverse campus hiring committee determined the position for the Director of Counseling. *Id.* at 11. Once more, Harrison explained that the committee unanimously agreed to hire Murphy based on her comparatively higher number of years of experience as a secondary level counselor, and her ability to speak Spanish. *Id.* at 11–12.

---

[12] On September 24, 2020, Summers requested the presence of Dr. Daniel Spikes from Human Resources to attend the conference. Ex. 31, Doc. No. 13-3 at 20. On that same date, Assistant Superintendent Slaton denied Summers's request because he "is the designee for Title IX," and her complaint did not fall under that purview. *Id.*

On October 14, 2020, Reverend McClain also requested that Dr. Daniel Spikes from Human Resources be present at this conference. Ex. 29, Doc. No. 13-3 at 18. On that same date, Superintendent Torres denied Reverend McClain's request because he "was not involved in any aspect of the decision about which this complaint is raised." *Id.* at 17. Summers also complained about Spikes's absence in her Level II Conference, asserting that her rights were not protected, and raises the same complaint in her *First Amended Complaint*.

Lastly, Harrison explained that Summers's grievances relating to—(1) the hiring of the "Success Coach" position, (2) the LHS principal's refusal to pay for Summers to attend the October 2019 conference, (3) LHS's refusal to provide media coverage for "Empower"; (4) complaints regarding the STS gala; and (5) the other positions for which Summers complained she was not hired —were all untimely.  *Id.*  On October 29, 2020, Assistant Superintendent Shelly Slaton sent a letter to Summers and Reverend McClain, denying Summers's internal grievance at the Level II stage because "there is no evidence . . . of any racial bias or animus against Ms. Summers."  *Id.* at 13.

On November 12, 2020, Summers filed her Level III Appeal Notice.[13]  Ex. 32, Doc. No. 13-3 at 23.  Unlike her grievances at the Levels I and II stages, Summers's Level III Appeal Notice complained about LISD failing to follow its own policies during the grievance process because: (1) Superintendent Torres was not present at either Level I or II Conference; (2) Summers felt her rights were not protected because "neither Dr. Spikes [n]or any other representative of the Human Resource Department was [ ] present"; (3) the LHS or LISD website made employee complaint forms "readily available online" on the date of Summers's Level II Conference, suggesting she has a right to a representative from Human Resources; and (4) her internal grievance process started at the Level I stage rather than the Level II stage.  *Id.* at 25–28.

On November 16, 2020, Slaton sent a letter to Summers and Reverend McClain, stating that Summers's Level III Appeal Notice was "incomplete with material information," but that the District would allow "until 12:00 pm on Thursday, November 19, 2020 in which to file a supplemental and amended Level III Appeal Notice."  Ex. 27, Doc. No. 13-3 at 9.  The letter

---

[13] The court notes that the bottom of Summers's Level III Appeal Notice provides the following warning: "A complaint or appeal form that is incomplete in any material way may be dismissed but may be refiled with all the required information if the refiling is within the designated time for filing a complaint or appeal."  Ex. 32, Doc. No. 13-3 at 24.

concluded that Summers needed "to specify exactly which policies and which applicable laws [she] reviewed that apply to this circumstance and [that she] must specifically designate in what ways those school policies and applicable laws were not properly addressed," as well as which problems were not properly corrected.  *Id.*  Otherwise, Slaton concluded, "the District will not schedule a Level III Presentation and may dismiss this appeal entirely."  *Id.*

On December 8, 2020, Slaton sent a letter to Summers and Reverend McClain, informing both parties that "virtually all of the matters [Summers] seek[s] to appeal are outside the scope of [her] original employee complaint filed under policy DGBA.  In addition, [her] complaints tend to be procedural in nature and not addressing specifically any substantive complaint that [she] previously made."  Ex. 25, Doc. No. 13-3 at 2.  This letter repeated that: (1) Summers "[has] still not provided any specific facts or evidence" in support of her Level I complaint that she "was denied the opportunity for economic progress because of [her] strained relationship with administration (downtown) and/or because of [her] race," (2) that she failed to provide evidence to refute that "no one in the central administration of the District was involved in any way of the making of the unanimous recommendation of the interview and employment committee at [LHS]," and that (3) administration adopted the "unanimous recommendation of that committee . . . without any question or involvement by the administration."  *Id.*

Furthermore, Slaton's letter states that Summers's Level III Appeal Notice "now complains about entirely new matters[,] such as whether or not the District has violated policy DC(LEGAL) or Texas Education Code § 11.1513," and that her appeal "is speculative, never happened, and is impossible to have caused any harm."  *Id.* at 3.  Slaton continued that because this is a new complaint, regarding a separate matter, such allegations "must be the subject of a new complaint

as it is impossible to add new issues and new complaints to a complaint filed timely months ago." *Id.*

Slaton concluded her letter by stating that: (1) there was no need for Torres to be present for her internal grievance conferences because did not have any role in any employment decision complained about in her complaint; (2) Summers failed to cite to any authority stating that she has a right to a Human Resources representative present during the hearings; (3) Summers failed to cite to any policy or law that the Board of Trustees violated; (4) her "equal representation" complaint was outside the scope of her original complaint and therefore this issue would not be presented to the Board of Trustees at Level III; (5) the District provided her with additional due process by providing her with a Level I *and* II grievance, rather than only a Level II grievance as Summers requested; (6) her Level III Appeal "does not identify any policy, regulation or law that was violated by the District within the scope of [her] original complaint," therefore the Board of Trustees cannot decide these issues; and (7) her Level III Appeal raises issues "substantially outside of the scope of [her] original complaint" and the Board of Trustees will therefore not entertain those arguments on appeal. *Id.* at 3–4.

On December 15, 2020, Summers sent a letter to Slaton, requesting "to be placed on the school [B]oard of [T]rustees['] agenda so that [she] can present [her] case to the board, in a public setting." Ex. 24, Doc. No. 13-3 at 1. On December 17, 2020, Slaton informed Summers that "[f]rom this point forward[,] all communication regarding the [L]evel 3 appeal will be communicated through Mr. Wayne Haglund[,] as he represents the Board." Ex. 22, Doc. No. 13-2 at 36.

On December 18, 2020, LISD attorney Wayne Haglund sent a letter to Summers regarding her Level III Conference before the Board of Trustees. Ex. 21, Doc. No. 13-2 at 34. Haglund

confirmed that LISD would not deny her Level III Conference, and stated that Summers had "misread and misrepresented what Ms. Slaton has said in her previous communication." *Id.* Instead, Haglund affirmed that in order to schedule her Level III Conference, Summers *must* "provide the specific information requested in her previous correspondence to [her], which the District interprets the policy to require." *Id.* Thus, Haglund repeated that Summers "must provide and identify the policies or laws which [she] claim[s] the District has already violated earlier in this particular complaint process, not policies or laws that [she] believe[s] may be violated in the future," and that she must also explain how those policies and laws "were not properly addressed or corrected by the District." *Id.* at 34–35 (internal quotation marks omitted). Haglund concluded his letter by stating that Summers's Level III Conference would be scheduled once she has completed these prerequisites. *Id.* at 35.

On that same date, Summers responded to Haglund regarding LISD's failure to schedule her Level III grievance. Ex. 20, Doc. No. 13-2 at 29. In this letter, Summers maintained that she has "provided you all with everything that you have requested, and still I have yet to be granted approval to present my grievance to the board. Therefore, I have been denied [the right] to do so." *Id.* As such, Summers represented that "regardless of whether or not I provide the additional information requested, my right to present my grievance will not be taken away." *Id.* (quoting TEX. EDUC. CODE § 11.1513(i) ("The employment policy must provide each school district employee with the right to present grievances to the district board of trustees.")). On January 13, 2021, Summers sent a second letter to LISD attorney Wayne Haglund repeating the same arguments. Ex. 18, Doc. No. 13-2 at 27.

On January 22, 2021, Haglund responded to Summers's letters, maintaining that she must "identify exactly which laws and policies [she] reference[s] in claiming that the School District

has violated these laws or policies earlier in this complaint process."  Ex. 17, Doc. No. 13-2 at 25.

Additionally, Haglund informed Summers that she must also specify the ways that the School

District has violated those laws or policies.  *Id.*  Only then would Haglund ask the School District

to schedule her Level III conference.  *Id.*

On January 25, 2021, Summers responded to Haglund's letter, repeating that she had a

legal right to present her grievance to the school board, and that "[b]y **law**, [she is] not required to

identify laws or policies that the School District has violated in order to present [her] grievance to

the board."  Ex. 13, Doc. No. 13-2 at 21 (emphasis in original).  In her letter, and in her present

*Complaint*, Summers contends that she has "been wrongfully denied the right to present [her]

grievance to the [B]oard."  *Id.*; *see also* First Am. Compl., Doc. No. 13 at 24–25, ¶ 76.

### ii.    EEOC Complaint

In May 2020, Summers met with an EEOC representative, but took no action.  Doc. No.

13 at 19, ¶ 57.  On October 5, 2021, Summers filed a charge of discrimination with the Equal

Employment Opportunity Commission ("EEOC"), alleging race discrimination and retaliation.

Doc. No. 13 at 4, ¶ 11.

### iii.    Present Lawsuit

On January 26, 2022, Summers filed her *Original Petition and Jury Demand* (Cause No.

CV-00047-22-01) in the 159th Judicial District Court of Angelina County, Texas.  Ex. 2, Doc. No.

1-2 at 8.  On February 28, 2022, Defendants removed the present action to federal court.  Doc. No.

1.  On June 20, 2022, Summers filed her operative *First Amended Complaint* (Doc. No. 13),

alleging (1) violations of LISD Policies DGBA, DC, and DIA; (2) violations of Chapter 21 of the

Texas Labor Code for race discrimination for LISD's failure to promote her, and unlawful

retaliation; and (3) liability under 42 U.S.C. § 1983 for depriving her constitutional rights to

substantive and procedural due process under the Fourteenth Amendment to the U.S. Constitution and retaliation in violation of her First Amendment right to free speech.  Doc. No. 13 at 32–36.

On July 18, 2022, Defendants filed the instant *Motion to Dismiss Plaintiff's First Amended Complaint* ("Motion to Dismiss" or "Motion") pursuant to Federal Rule of Civil Procedure 12(b)(6).  Doc. No. 17.  On August 26, 2022, Summers filed her *Response to Defendants' Motion to Dismiss*.  Doc. No. 29.  On August 30, 2022, Summers filed an *Unopposed Motion for Leave to File Errata for Response to Motion to Dismiss* ("Motion for Leave") (Doc. No. 31), and her *Errata for Plaintiff's Response to Defendants' Motion to Dismiss* (Doc. No. 32) ("Response"), including an index of included attachments and attachments in response to Defendants' instant motion.[14] Judge Truncale granted Summers's *Motion for Leave* on August 31, 2022.  Doc. No. 33.  On September 2, 2022, Defendants filed their *Reply in Support of Motion to Dismiss* ("Reply") (Doc. No. 34).

On December 30, 2022, Judge Truncale referred the instant *Motion to Dismiss* to the undersigned for consideration and disposition.  On February 14, 2023, Defendants filed their *Motion to Compel Discovery from Plaintiff* ("Motion to Compel"), which Judge Truncale referred to the undersigned on February 16, 2023.  Doc. No. 39.  Because the pending *Motion to Dismiss* is dispositive, and as it is fully briefed and ripe for consideration, the court will first address this instant motion.

## II.    Legal Standards

### A.    Subject-Matter Jurisdiction

Defendants move to dismiss the present action for failure to state a claim under Rule 12(b)(6).  Doc. No. 17.  In every case, however, the court has an independent duty to *sua sponte*

---

[14] The court will limit its review of Summers's response to only Summers's *Errata for Plaintiff's Response* (Doc. No. 32).

determine whether it properly has subject-matter jurisdiction. *Ruhgras AG v. Marathon Oil Co.*, 526 U.S. 574, 583 (1999) ("[S]ubject-matter delineations must be policed by the courts on their own initiative even at the highest level."); *Tex. Div., Sons of Confederate Veterans v. Vandergiff*, 759 F.3d 388, 392 (5th Cir. 2014) ("Neither party has argued that this court lacks jurisdiction, but federal courts have a duty to consider their subject matter jurisdiction *sua sponte*."), *rev'd on other grounds*, 135 S. Ct. 2236 (2015); *City of Sachse, Tex. v. Kan. City S. Ry. Co.*, 564 F. Supp. 2d 649, 653 (E.D. Tex. 2008) (Schell, J.) (citing *Dominguez-Cota v. Cooper Tire & Rubber Co.*, 396 F.3d 650, 652 n.1 (5th Cir. 2005)) ("[T]he court has an affirmative duty to raise [] issues regarding subject matter jurisdiction, *sua sponte*, whenever a problem with subject matter jurisdiction is perceived.").

Federal courts are courts of limited jurisdiction, meaning they possess only the "power authorized by [the] Constitution and statute." *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994) (internal citations omitted); *Home Builders Assoc. of Miss., Inc. v. City of Madison, Miss.*, 143 F.3d 1006, 1010 (5th Cir. 1998) ("A case is properly dismissed for lack of subject matter jurisdiction when the court lacks the statutory or constitutional power to adjudicate the case."). "It is to be presumed that a cause lies outside this limited jurisdiction, . . . and the burden of establishing the contrary rests upon the party asserting jurisdiction." *Kokkonen*, 511 U.S. at 377 (internal citations omitted). If a federal court lacks subject-matter jurisdiction, it must dismiss the case.

Moreover, a trial court may dismiss a case in whole, or in part, for lack of subject-matter jurisdiction based on: "(1) the complaint alone; (2) the complaint supplemented by undisputed facts evidenced in the record; or (3) the complaint supplemented by undisputed facts plus the

court's resolution of disputed facts." *Crane v. Johnson*, 783 F.3d 244, 251 (5th Cir. 2015) (footnote and citation omitted).

i.    *Article III Standing*

Additionally, "the jurisdictional issue of standing is a legal question" for the court to determine, and "[t]he party invoking federal jurisdiction bears the burden of establishing standing." *Id.* (footnotes and citations omitted).  Accordingly, "[b]ecause the issue of standing is one of subject matter jurisdiction," federal courts must raise it *sua sponte*.  *Cobb v. Central States*, 461 F.3d 632, 635 (5th Cir. 2006); *see also Serafine v. Crump*, 800 F. App'x 234, 236 (5th Cir. 2020) (per curiam) (internal citation omitted) ("[I]t goes without saying that we may *sua sponte* consider Article III standing."); *Ford v. NYLCare Health Plans of Gulf Coast, Inc.*, 301 F.3d 329, 331–32 (5th Cir. 2002) (footnote and citation omitted) ("Although Article III constitutional standing was not raised by the parties . . . we must—where necessary—raise it *sua sponte*.").

"Article III of the United States Constitution limits the jurisdiction of federal courts to actual 'Cases' and 'Controversies.'" *Crane*, 783 F.3d at 251 (citing U.S. Const., art. III, § 2).  As such, the "irreducible constitutional minimum of standing" contains three elements:  First, the plaintiff must have suffered an "injury in fact" that is both (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical.  *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338, 339 (2016) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992)).  Second, the plaintiff must allege a "causal connection" between the injury and the allegedly unlawful conduct, such that the injury is "fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court." *Lujan*, 504 U.S. at 560 (cleaned up) (citation and quotation marks omitted).  Third, "it must be 'likely,' as opposed to merely

'speculative,' that the injury will be 'redressed by a favorable decision.'"  *Id.* (citation and quotation marks omitted).

The party invoking federal jurisdiction—here, Summers—bears the burden of establishing all three elements; a "[f]ailure to establish any one [of them] deprives the federal courts of jurisdiction to hear the suit."  *Lujan*, 504 U.S. at 561; *Rivera v. Wyeth-Ayerst Labs.*, 283 F.3d 315, 319 (5th Cir. 2002) (citing *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 103 (1998)).  As such, Summers bears the burden of establishing "standing for each claim [she] seeks to press and for each form of relief that is sought."  *Town of Chester, N.Y. v. Laroe Ests.*, 581 U.S. 433, 439 (2017) (quoting *Davis v. Fed. Election Comm'n*, 554 U.S. 724, 734 (2008)); *Davis*, 554 U.S. at 733–34 ("The fact that Davis has standing to challenge § 319(b) [of the Bipartisan Campaign Reform Act of 2002] does not necessarily mean that he also has standing to challenge the scheme of contribution limitations that applies when § 319(a) comes into play.")

### B.  Rule 12(b)(6)

Under Rule 12(b)(6), a court may dismiss a complaint for "failure to state a claim upon which relief can be granted."  Fed. R. Civ. P. 12(b)(6).  As a preliminary matter, it is well-established that the federal pleading standards set forth by *Twombly* and *Iqbal* apply in *Monell* liability cases.  *Bond v. Nueces Cnty., Tex.*, No. 20-40050, 2022 WL 4595000, at *5 (5th Cir. Sept. 30, 2022) (citations omitted) ("[S]ince *Twombly* and *Iqbal*, this court has resumed applying the rule that a plaintiff must plead specific past instances to allege municipal liability."); *Ratliff v. Aransas Cnty., Tex.*, 948 F.3d 281, 284 (5th Cir. 2020), *cert. denied*, 141 S. Ct. 376 (2020) (citations omitted) ("Indeed, our precedents make clear that the *Twombly* standard applies to municipal liability claims.").

To survive a Rule 12(b)(6) motion to dismiss under *Twombly* and *Iqbal*, a complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Gonzalez v. Kay*, 577 F.3d 600, 603 (5th Cir. 2009) (quoting *Iqbal*, 556 U.S. at 678). The plaintiff's complaint "does not need detailed factual allegations," but her complaint "must raise a right to relief above the speculative level," providing "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action." *Twombly*, 550 U.S. at 555; *Stringer v. Remington Arms Co., L.L.C.*, 52 F.4th 660, 661 (5th Cir. 2022) (citations omitted).

When assessing a motion to dismiss under this rule, the court must accept as true all well-pleaded facts in the plaintiff's complaint and view those facts in the light most favorable to the plaintiff. *Bowlby v. City of Aberdeen*, 681 F.3d 215, 219 (5th Cir. 2012). However, courts must "identify and disregard conclusory allegations because they are 'not entitled to the assumption of truth.'" *Lamar Cnty. Elec. Coop. Ass'n v. McInnis Bros. Constr., Inc.*, No. 4:20-CV-930, 2021 WL 1061188, at *4 (E.D. Tex. Mar. 19, 2021) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 664 (2009)). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678 (internal citation omitted).

Moreover, the court's review is limited "to the complaint, any documents attached to the complaint, and any documents attached to the motion to dismiss that is central to the claim and referenced by the complaint." *Lone Star Fund V (U.S.), L.P. v. Barclays Bank PLC*, 594 F.3d 383, 387 (5th Cir. 2010) (citation omitted); *see also Jones v. Adm'rs of Tulane Educ. Fund*, 51 F.4th 101, 111 (5th Cir. 2022) (internal citation and quotation marks omitted) ("Documents that a

defendant attaches to a motion to dismiss are considered part of the pleadings if they are referred to in the plaintiff's complaint and are central to her claim.").

## III.    Discussion

In her *First Amended Complaint*, Summers alleges (1) LISD and Torres violated LISD Policies DGBA, DC, and DIA; (2) LISD unlawfully discriminated against her because of her race, and retaliated against her, in violation of Chapter 21 of the Texas Labor Code; and (3) LISD and Torres are liable under 42 U.S.C. § 1983 for violating her Fourteenth Amendment rights under the Due Process Clause, and that both defendants unlawfully retaliated against her in violation of her First Amendment guarantee of free speech.[15]  *See* First Am. Compl., Doc. No. 13 at 32–36. Defendants Torres and LISD move to dismiss the entire *Complaint*.  Doc. No. 17.  Before addressing the merits of Summers's *Complaint* and the instant motion, the court will first turn to two preliminary issues raised by the parties.

### A.    Preliminary Issues

#### i.    Documents Attached to Summers's Response

Summers attached twenty-seven (27) exhibits, consisting of 144 pages, to her *Response*. Doc. No. 32.  In their *Reply*, Defendants object to the following three attached exhibits because "they were neither attached to nor referenced in the First Amendment Complaint, and/or because they do not contain adjudicative facts of which the Court may take judicial notice":

> (1) Exhibit A: an alleged transcript of a conversation that took place on February 22, 2019 between Summers and Deputy Superintendent Kurt Stephens, and a "verification" signed by Summers authenticating the transcript;

---

[15] In their *Motion*, Defendants also moved to dismiss a potential Equal Protection Clause claim.  *See* Defs.' Mot., Doc. No. 17 at 15 ("It is unclear whether Summers intended to include her prior equal protection claims in her Amended Complaint, but, to the extent that she did, she has failed to state a valid claim.").  Summers's *Complaint* (Doc. No. 13) and *Response* (Doc. No. 32) are both devoid of any mention of the Equal Protection Clause, and the court will not analyze claims which are not actually pleaded.  *See* FED. R. CIV. P. 8(a)(2) (requiring a "short and plain statement of the claim showing that the pleader is entitled to relief").

(2) Exhibit B: A recitation of the timeline of events that give rise to the
current action; and

(3) Exhibit Q: A June 17, 2020 letter from the Internal Revenue Service
("IRS"), informing the entity "Embrace It" that it has achieved tax
exempt status under Internal Revenue Code Section 501(c)(3).

Defs.' Reply, Doc. No. 34 at 1–2; Pl.'s Resp., Exs. A, B, Q, Doc. Nos. 32-2, 32-3, 32-28.

Summers has not filed a sur-reply in response to Defendants' objections.  Regardless, the
undersigned agrees with Defendants and will not consider these exhibits attached to Summers's
*Response* in assessing the instant motion.  When considering a motion under Rule 12(b)(6), "the
factual information to which the court addresses its inquiry is limited to the (1) facts set forth in
the complaint, (2) documents attached to the complaint, and (3) matters of which judicial notice
may be taken under Federal Rule of Evidence 201."  *Walker v. Beaumont Indep. Sch. Dist.*, 938
F.3d 724, 735 (5th Cir. 2019) (citations omitted).

Additionally, a court may also consider documents attached to a plaintiff's response to a
motion to dismiss, but only if "the documents are referred to in the pleadings and are central to
[the] plaintiff's claims."  *Brand Coupon Network, L.L.C. v. Catalina Mktg Corp.*, 748 F.3d 631,
636 (5th Cir. 2014) (collecting cases).  The court will generally review attached exhibits to a
response when neither party questions the exhibits' authenticity, and when the documents are
"sufficiently referenced in the complaint to permit their consideration on a motion to dismiss."
*Walch v. Adjutant Gen.'s Dep't of Tex.*, 533 F.3d 289, 294 (5th Cir. 2008) (citing 5B CHARLES
ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 1357
(3d ed. 2004)).  In that same vein, a court may only take judicial notice of a fact that is "not subject
to a reasonable dispute because it": (1) is "generally known" in the district court's jurisdiction; or

(2) "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." FED. R. EVID. 201(b)(1)–(2).

Here, the court must exclude all three of Summers's attached exhibits to her *Response* (Doc. No. 32). First, the court excludes Summers's own alleged transcript of the conversation that took place between herself and Stephens because (1) Defendants object to its authenticity, and thus it *is* "subject to a reasonable dispute," (2) Summers's *Complaint* never referenced evidence of this transcript (Doc. No. 13), and (3) because the court cannot "accurately and readily determine" its accuracy, as Summers is the source of her own document and her accuracy is reasonably in question because she is a party to this case. *Compare with Walch*, 533 F.3d at 294 ("No party questions the authenticity of these two documents and both were sufficiently referenced in the complaint to permit their consideration on a motion to dismiss."); FED. R. EVID. 201(b)(1)–(2).

Second, the court need not consider Summers's own recitation of the timeline of events, as attached in Exhibit B to her *Response*. Ex. B, Doc. No. 32-2. For this exhibit, the court will limit its review to Summers's *First Amended Complaint* (Doc. No. 13), as this attached recitation was redundant and not "sufficiently referenced in [her] complaint." *Walch*, 533 F.3d at 294. Lastly, the court will evidently not take into consideration Summers's attachment of the IRS letter informing the entity "Embrace It" that it has achieved tax-exempt status. Ex. Q, Doc. No. 32-28.[16] Summers's *Complaint* is devoid of any reference to this IRS letter, and further, the court cannot discern how it is "central" to Summers's claims. *Brand Coupon Network*, 748 F.3d at 636. Accordingly, the undersigned recommends granting all three of Defendants' objections, and will not consider these aforementioned exhibits in its review of the pending motion.

---

[16] The undersigned is similarly confused by Summers's attachment of this exhibit and admonishes Plaintiff's counsel to either take greater care when filing documents with this court, or alternatively, provide an adequate explanation for such extraneous filings, if indeed, they are relevant to the instant matter.

*ii.    Abandoned Claims*

Next, Defendants argue that Summers has failed to meaningfully respond to the arguments

set forth in their *Motion to Dismiss* (Doc. No. 17), and therefore, Summers has "abandoned most

of her claims."  Defs.' Reply, Doc. No. 34 at 2–3.  In support of this contention, Defendants cite

to the Eastern District of Texas's Local Rule CV-7(d), stating:

> Under Eastern District Local Rule CV-7(d), 'a party's failure to oppose a motion
> [with a concise statement of the reasons in opposition to the motion] creates a
> presumption that the party . . . has no evidence to offer in opposition to the motion.

Defs.' Reply, Doc. No. 34 at 3 (alteration in original).

As a threshold matter, this is not what Local Rule CV-7(d) states.  The pertinent part of

Local Rule CV-7(d) concerning failure to oppose a motion states, in full, that: "A party's failure

to oppose a motion *in the manner prescribed herein* creates a presumption that the party does not

controvert the facts set out by movant and has no evidence to offer in opposition to the motion."

E.D. Tex. Local Rule CV-7(d) (emphasis added).  Defendants have therefore construed the text of

this rule by replacing the words "manner prescribed herein" with the contents of the preceding

sentence in the rule—that "[b]riefing shall contain a concise statement of the reasons in opposition

to the motion and a citation of authorities upon which the party relies."  *Id.*

When construing the terms of a local rule, as with a statute or with the Federal Rules of

Civil Procedure, the court must begin with the plain text of the rule.  *Compare Pavelic & LeFlore

v. Marvel Entm't. Grp.*, 493 U.S. 120, 123 (1989) (internal citations and quotation marks omitted)

(cleaned up) ("We give the Federal Rules of Civil Procedure their plain meaning, . . . and generally

with them as with a statute, when we find the terms unambiguous, judicial inquiry is complete.")

*with Scott v. MEI, Inc.*, No. 21-10680, 2022 WL 1055576, at *3 (5th Cir. Apr. 8, 2022) (per curiam)

("[T]he *plain text* of the Northern District of Texas's local rules authorizes . . .");  *Personalized*

*Media Commc'ns, LLC v. Apple, Inc.*, No. 2:15-CV-01366-JRG, 2021 WL 357495, at *4 (E.D. Tex. Feb. 2, 2021) ("Local Rule CV-26(a) state[s] in plain, unmistakable language, that . . ."); *Morrison v. Walker*, No. 1:13-CV-00327-KFG, 2018 WL 9812710, at *3 (E.D. Tex. Aug. 1, 2018) (construing Local Rule CV-7(l) according to its "plain language").

Here, the term "manner" is defined as "[a] way in which a thing is done or happens" or "[a] way of doing something or the way in which a thing is done or happens."[17]  Accordingly, when Local Rule CV-7(d) refers to "the manner prescribed herein," it is most likely referring to the *method* of the opposing party filing a response with an accompanied proposed order, and not the *adequacy* of the substance contained in the response therein.  Indeed, courts in this District construe this rule to mean that the presumption only exists if the opposing party fails to file a response at all.  *See Tisdale v. Enhanced Recovery Co., LLC*, No. 4:22-CV-00286-SDJ-CAN, 2023 WL 1810413, at *13 n.27 (E.D. Tex. Jan. 17, 2023) (emphasis added) (citing E.D. Tex. Local Rule CV-7(d)) ("*Because Plaintiff did not file a response* to ERC's Rule 12(b)(6) ground, the Court presumes Plaintiff does not controvert the applicable factual allegations and has no evidence to offer in opposition."); *Auguston v. Nat'l Admin. Serv. Co., LLC*, No. 4:21-cv-819-ALM-KPJ, 2023 WL 1810397, at *4 (E.D. Tex. Jan. 11, 2023) (emphasis added) (citing E.D. Tex. Local Rule CV-7(d)) ("*To date, Plaintiff has not responded to the Motions* . . . Plaintiff's failure to respond creates a presumption he has no facts to controvert Defendants' motions.").

Here, Summers has clearly filed a *Response* brief (Doc. No. 32), and accordingly, Local Rule CV-7(d) simply cannot apply.  Moreover, the undersigned does not agree that Summers abandoned her claims because she failed to meaningfully respond to Defendants' arguments.  "A

---

[17]*Manner*, OXFORD DICTIONARIES, http://premium.oxforddictionaries.com/us/definition/americanengli sh/manner (last visited Feb. 28, 2023); Houghton Mifflin Harcourt, THE AMERICAN HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE 1068 (5th ed. 2011).

plaintiff abandons claims when it fails to address the claims or oppose a motion challenging those claims." *Terry Black's Barbecue, L.L.C. v. State Auto. Mut. Ins. Co.*, 22 F.4th 450, 459 (5th Cir. 2022) (citations omitted) (plaintiff abandoned claims because it "fail[ed] to defend them in its response" and "did not address [certain] claims at all."); *see also United States ex rel. Sparks v. IntegraCare Home Health Servs., Inc.*, No. 6:14-CV-480-JDK, 2022 WL 2709685, at *9 (E.D. Tex. Mar. 1, 2022) (citation omitted) ("A litigant's failure to pursue a claim beyond her complaint, in response to a motion to dismiss, constitutes abandonment of that claim.").

Thus, while the undersigned agrees that Summers's *Response* did not meaningfully respond to the arguments set forth in Defendant's *Motion to Dismiss*, her *Response* briefs all the claims alleged in her *First Amended Complaint* (Doc. No. 13).  Such briefing, regardless of how adequate, demonstrates that Summers has "address[ed] [her] claims" and is still pursuing them beyond her complaint.  *Terry Black's Barbecue*, 22 F.4th at 459; *Sparks*, 2022 WL 2709685, at *9.  As such, Summers has not abandoned her claims.  The court will now turn to the merits of the instant action, first addressing jurisdictional deficiencies in Summers's standing to pursue her claims.

### B.  Subject-Matter Jurisdiction

#### i.  Article III Standing

Defendants move to dismiss the present action, in part, because Summers lacks subject-matter jurisdiction to prosecute her claims under Chapter 21 of the Texas Labor Code.  *See* Defs.' Mot., Doc. No. 17 at 23–28.  Neither party has addressed whether Summers has constitutional or prudential standing to pursue her claims, however the court has an independent obligation to *sua sponte* determine whether it properly has subject-matter jurisdiction.  *Ruhrgas AG*, 526 U.S. at 583; *Vandergiff*, 759 F.3d at 392, *rev'd on other grounds*, 135 S. Ct. 2236 (2015); *Kan. City S. Ry. Co.*, 564 F. Supp. 2d at 653.  Once more, Article III standing requires the plaintiff

at all times, and for each claim, show that she has suffered "(1) an injury-in-fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo*, 578 U.S. at 338 (citing *Lujan*, 504 U.S. at 650); *Town of Chester*, 581 U.S. at 439.  The court will address only the first element and assess whether Summers has met her burden in "clearly alleg[ing] facts" that demonstrate she has suffered an injury. *Spokeo*, 578 U.S. at 338 (citation and quotation marks omitted).

To establish an injury-in-fact, a plaintiff must show that she has suffered "an invasion of a legally protected interest" that is both "concrete and particularized" and "actual or imminent, not conjectural or hypothetical." *Spokeo*, 578 U.S. at 339 (citing *Lujan*, 504 U.S. at 560).  A "particularized' injury is one that affects the plaintiff "in a personal and individual way," while a "concrete" injury is one that is real, not abstract, and "actually exist[s]." *Id.* at 339–40.  "At the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice." *Lujan*, 504 U.S. at 561 (citation omitted).

a.   Moot Claims

First, the court will address claims that are decidedly moot, as demonstrated in Summers's own pleadings.

The doctrine of mootness is a variation of the injury-in-fact inquiry: "mootness can be described as 'the doctrine of standing set in a time frame: The requisite personal interest that must exist at the commencement of the litigation (standing) must continue throughout its existence (mootness).'" *Friends of the Earth, Inc. v. Laidlaw Env'tl Servs. (TOC), Inc.*, 528 U.S. 167, 170 (2000) (citations omitted) (emphases in original).  As such, the doctrine of mootness is also a jurisdictional issue that the court must raise *sua sponte*. *North Carolina v. Rice*, 404 U.S. 244, 246 (1971)  (internal citations and quotation marks omitted) ("Mootness is a jurisdictional question

because the Court is not empowered to decide moot questions or abstract propositions."); *Hinkley v. Envoy Air, Inc.*, 968 F.3d 544, 548 (5th Cir. 2020) (quoting *Bailey v. Southerland*, 821 F.2d 277, 278 (5th Cir. 1987) (per curiam)) ("[B]ecause mootness stems from Article III's 'case or controversy' requirement, 'in the absence of its being raised by a party, our court is obliged to raise the subject of mootness *sua sponte*.'").

"[A] claim becomes moot 'when the issues presented are no longer 'live' or the parties lack a cognizable interest in the outcome." *Ermuraki v. Renaud*, 987 F.3d 384, 386 (5th Cir. 2021) (per curiam) (quoting *La. Env't Action Network [LEAN] v. U.S. E.P.A.*, 382 F.3d 575, 580 (5th Cir. 2004)). Accordingly, "mootness applies when intervening circumstances render the court no longer capable of providing meaningful relief to the plaintiff." *Id.* (citation and quotation marks omitted); *LEAN*, 382 F.3d at 581 (citation omitted) ("If a dispute has been resolved, or if it has evanesced because of changed circumstances, it is considered moot."). Intervening circumstances moot a claim or case when the plaintiff has already received full redress for their injuries related to her claim(s), and the court is left powerless to continue entertaining such abstract disputes. *See Campbell-Ewald Co. v. Gomez*, 577 U.S. 153, 164 n.5 (2016) (citing *Alvarez v. Smith*, 558 U.S. 87 (2009) and *Already, LLC v. Nike, Inc.*, 568 U.S. 85 (2013)) (In both *Alvarez* and *Already*, the plaintiffs had received full redress for the injuries asserted in their complaints."); *Spell v. Edwards*, 962 F.3d 175, 179 (5th Cir. 2020) (quoting *Knox v. Serv. Emps. Int'l Union, Local 1000*, 567 U.S. 298, 307 (2012)) ("A matter is moot 'when it is impossible for a court to grant any effectual relief whatever to the prevailing party.'").

Here, Summers complains that she experienced difficulty in getting approval for her female-diversity club, "Empower," and had to present data and meet with campus administration regarding why LHS needed this club. Doc. No. 13 at 17, ¶ 47. Eventually, however, LISD

approved of "Empower," and it existed as an LHS club thereafter.  *Id.*, ¶ 48.  Next, Summers

complains that LISD informed her in March 2023 that she would receive an "extra duties" stipend,

but did not receive this money until the following school-year.  *Id.* at 25, ¶ 78.

Moving along, Summers repeatedly complains about receiving an initial score of a "3"

instead of a "4" in her 2020–21 school-year performance evaluation.  Doc. No. 13 at 8, ¶ 17(c)(iii),

25 ¶¶ 17(c)(ii)–(v), 79.  On September 7, 2021, Gabriela Murphy sent a letter to Summers, serving

as "written proof" that Murphy changed Summers's evaluation from a "3" to a "4" for a certain

sub-section of her evaluation.  Ex. 11, Doc. No. 13-2 at 21.  Moreover, Summers presumes that

her 2021–22 school year performance evaluation was revised to a score of "4" from its initial score

of a "3".  Doc. No. 13 at 7, ¶ 17(c)(iv).  Lastly, Summers complains about Public Relations Director

Sheila Adams's initial refusal to share a flier regarding a school club in the LISD newsletter.  *Id.*

at 29, ¶ 96.  On March 29, 2022, Summers represents that LISD posted Summers's requested flier

in its newsletter.  *Id.* at 30, ¶ 101.

The court recommends that each and every allegation described above is decidedly moot.

In each circumstance, Summers received her requested relief for her complained-of injuries: she

received approval for her school club "Empower"; received her stipend for her "extra duties" labor

during the following school year; received a "4" instead of a "3" on her performance evaluations

for both the 2020–21 (sub-section score) and 2021–22 school years, as she desired; and achieved

her goal of placing a fundraiser for a school club in LISD's newsletter.  These aforementioned

instances therefore do not present live controversies for the court to provide meaningful relief to

Summers—she has already received full redress for each and every injury listed above.

*Campbell-Ewald Co.*, 577 U.S. at 164 n.5; *Ermuraki*, 987 F.3d at 386.  Accordingly, these

complained-of injuries are moot and the court lacks jurisdiction to entertain them any further.

b.  <u>Prudential Standing Limitations</u>

Next, Summers raises complaints on behalf of her colleague Angela Roberts and on behalf of her diversity club, "Empower."  Specifically, regarding her colleague Angela Roberts, Summers complains that Roberts joined her in complaining about LISD's failure to publish the position of "Success Coach" so that all staff may apply, and additionally, that LISD "scored down" Roberts's performance evaluation as well.  *Id.* at 20, ¶ 61 ("Plaintiff and fellow African American Counselor, Angela Roberts asked [about why the Success Coach position was not posted].");  *id.* at 25, ¶ 79 ("Plaintiff's annual performance and another[,] Angela Roberts'[s] work performance[,] were scored down by Murphy . . .").

Regarding Summers's club "Empower," Summers complains of the following: (1) Superintendent Torres's Public Relations staff member, Sheila Adams's prohibition of allowing "Empower" to have access to media coverage because "Empower" was not yet an official LISD club; (2) Adams's refusal to allow "Empower" to place notice of a fundraiser in the LISD newsletter; and (3) LHS Principal Brandon Boyd's denial of "Empower's" request to go on an educational trip to Atlanta, Georgia.  *Id.* at 18, ¶ 50 ("Consequently, Adams blocked the Empower club from gaining media coverage [from] local news sources.");  *id.* at 24, ¶ 75 ("Sheila Adams, ignored our club['s] (Empower) request to have our fundraiser in the newsletter.");  *id.* at 25–26, ¶ 80 ("Empower Club requested to go on an educational trip to Atlanta, GA and [was] denied by Brandon Boyd (principal)) . . .").

As previously discussed, a plaintiff's injuries-in-fact must be both concrete *and* particularized: the injuries must be real rather than abstract or hypothetical (concrete) and they must affect the plaintiff "in a personal and individual way" (particularized).  *Spokeo*, 578 U.S. at

339.  Accordingly, such inquiries regarding the particularization of a plaintiff's injuries generally fall under "prudential" standing considerations, such as:

> [(1)] whether a plaintiff's grievance arguably falls within the zone of interests protected by the statutory provision invoked in the suit, [(2)] whether the complaint raises abstract questions or a generalized grievance more properly addressed by the legislative branch, and [(3)] whether the plaintiff *is asserting his or her own legal rights and interests rather than the legal rights and interests of third parties*.

*St. Paul Fire & Marine Ins. Co. v. Labuzan*, 579 F.3d 533, 539 (5th Cir. 2009) (emphasis added) (internal citation and quotation marks omitted).

Like Article III standing, prudential standing is a jurisdictional inquiry when addressing whether the plaintiff is asserting her own rights.  *See Cell Sci. Sys. Corp. v. La. Health Serv.*, 804 F. App'x 260, 263, 263 n.2 (5th Cir. 2020) (per curiam) (the requirement that a party "assert its own rights" is "jurisdictional in nature" and a matter of subject-matter jurisdiction); *Cibolo Waste, Inc. v. City of San Antonio*, 718 F.3d 469, 474 n.4 (5th Cir. 2013) (collecting cases) (federal courts retain discretion to *sua sponte* raise the issue of prudential standing because it "nonetheless affects justiciability.").  "It is the responsibility of the complainant clearly to allege facts demonstrating that [she] is a proper party to invoke judicial resolution of the dispute and the exercise of the court's remedial powers."  *Warth v. Seldin*, 422 U.S. 490, 518 (1975).

There are, however, exceptions to the requirement that a plaintiff assert only her own rights, namely, the doctrines of organizational or associational standing, and second, the doctrine of third-party standing.  First, "[a]n association may have standing either by showing it can sue on behalf of its members ("associational" standing) or sue in its own right ("organizational" standing)." *Tex. State LULAC v. Elfant*, 52 F.4th 248, 253 (5th Cir. 2022).  Organizational standing requires the organization to show that: (1) its members independently possess Article III standing,

(2) "'the interests the association seeks to protect are germane to the purpose of the organization,'" and (3) the claim and relief requested do not require participation of the individual members.  *Ctr. For Biological Diversity v. U.S. EPA*, 937 F.3d 533, 536 (5th Cir. 2019) (quoting *Tex. Democratic Party v. Benkiser*, 459 F.3d 582, 587 (5th Cir. 2006)).  The organization must show a "concrete and demonstrable injury to [its] activities—with the consequent drain on [its] resources," not "simply a setback to [its] abstract social interests."  *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982) (internal citation omitted).

The second prudential standing limitation is the doctrine of third-party standing. Ordinarily, a litigant "must assert [her] own legal rights and interests, and cannot rest [her] claim to relief on the legal rights or interests of third parties."  *U.S. Dep't of Labor v. Triplett*, 494 U.S. 715, 721 (1990) (citation and quotation omitted).  The rationale behind this rule is that "courts should not adjudicate such rights unnecessarily, and it may be that in fact the holders of those rights either do not wish to assert them, or will be able to enjoy them regardless of whether the in-court litigant is successful or not," and second, because the third party themself "usually will be the best proponents of their own rights."  *Singleton v. Wulff*, 428 U.S. 106, 113–14 (1976) (internal citation omitted).  There is, however, an exception to this general rule—a party that has otherwise satisfied Article III's standing requirements may seek to enforce the rights of a third party when: (1) the party has a "close" relationship with the possessor of the right; and (2) "there is a hindrance to the possessor's ability to protect its own interests."  *Kowalski v. Tesmer*, 543 U.S. 125, 129–30 (2004) (citations and quotation marks omitted).

Here, Summers has failed to satisfy her jurisdictional burden to show that she has properly brought claims on behalf of Angela Roberts and the school club "Empower."  First, Summers's *Complaint* states that she only brings this suit as an individual, not on behalf of "Empower" or

Roberts.  Doc. No. 13 at 1–2 (naming the parties to this action); *e.g.*, *Hutton v. Blaine Cnty. Sch. Dist. #61*, No. 1:19-CV-00116-DCN, 2020 WL 1339120, at *4 (D. Idaho Mar. 23, 2020) (same). Moreover, Summers has failed to satisfy the test for either organizational standing or third-party standing. *Ctr. For Biological Diversity*, 937 F.3d at 536 (5th Cir. 2019) (organizational standing test); *Kowalski*, 543 U.S. at 129–30 (third-party standing test).  This is fatal to Summers's claims on behalf of both "Empower" and Roberts because she carries the burden to prove this court has jurisdiction, including that she has "standing for each claim [she] seeks to press and for each form of relief that is sought."  *Town of Chester, N.Y.*, 581 U.S. at 439; *Kokkonen*, 511 U.S. at 377; *Crane*, 783 F.3d at 251.

Accordingly, the court will not entertain Summers's claims brought on behalf of either Angela Roberts, or the diversity club "Empower."  The court will next address jurisdictional deficiencies with Summers's *Complaint* as it pertains to raising LISD's Policies as an independent cause of action.

### ii.   School District Policies

Next, it appears that Summers alleges causes of action under LISD's own policies: DGBA, DC, and DIA (collectively, "LISD Policies").  *See* First Am. Compl., Doc. No. 13 at 32, ¶ 110; Pl.'s Resp., Doc. No. 32 at 25–35 (discussing the School Board's policies under an "arbitrary and capricious" standard).  While unclear to the court whether Summers alleges these policies as independent causes of action, the court nonetheless lacks subject-matter jurisdiction to entertain any such claim.

A plaintiff's failure to exhaust administrative remedies may constitute a jurisdictional defect, thereby establishing a basis for dismissal.  *Taylor v. U.S. Treasury Dep't*, 127 F.3d 470, 475 (5th Cir. 1997) (per curiam) (citations omitted) ("Whenever the Congress statutorily mandates

that a claimant exhaust administrative remedies, the exhaustion requirement is jurisdictional because it is tantamount to a legislative investiture of exclusive original jurisdiction in the agency."); *Townsend v. U.S. Dep't of Just. Immigr. & Naturalization Serv.*, 799 F.2d 179, 181 (5th Cir. 1986) (per curiam) ("When exhaustion is statutorily mandated, the requirement is jurisdictional.").

"The Texas Education Code grants the Texas Commissioner of Education (the "Commissioner") authority to resolve a limited number of disputes." *Shackelford v. Bonham Indep. Sch. Dist.*, No. 4:18-CV-00035, 2018 WL 3630153, at *2 (E.D. Tex. July 31, 2018) (citing *McIntyre v. El Paso Indep. Sch. Dist.*, 499 S.W.3d 820, 833 (Tex. 2016)); Tex. Educ. Code § 7.057(a). "Where the Legislature grants the Commissioner authority to resolve a dispute, parties to such disputes must seek relief from the Commissioner through an administrative appeal before resorting to the courts." *Shackelford*, 2018 WL 3630153, at *2 (quoting *McIntyre*, 499 S.W.3d at 823).

The Texas Commissioner of Education ("Commissioner") has exclusive jurisdiction over:

> (1)    The school laws of this state; or
>
> (2)    actions or decisions of any school district board of trustees that violate:
>
>> (A) the school laws of this state, or
>>
>> (B) a provision of a written employment contract between the school district and a school district employee, if a violation causes or would cause monetary harm to the employee

Tex. Educ. Code § 7.057(a).

"This grant of exclusive jurisdiction requires such claimants to exhaust local school district grievance procedure before filing suit." *Hous. Indep. Sch. Dist. v. Rose*, No. 01-13-00018-CV,

2013 WL 3354724, at *3 (Tex. App.—Houston [1st Dist.] July 2, 2013, no pet.); *Larsen v. Santa Fe Indep. Sch. Dist.*, 296 S.W.3d 118, 123 (Tex. App.—Houston [14th Dist.] 2009, pet. denied) (quoting *Emps. Ret. Sys. of Tex. v. Duenez*, 288 S.W.3d 905, 909 (Tex. 2009)) ("In deciding whether an administrative body has exclusive jurisdiction, we look to its authorizing legislation for an express grant of exclusive jurisdiction, or for a 'pervasive regulatory scheme' indicating an intent to confer exclusive jurisdiction.").  Under the Education Code, the "school laws of this state" comprises Titles 1 and 2 of the Code.  TEX. EDUC. CODE § 7.057(f)(2).  Further, Title 1, Section 26.011 states that:  "(a) The board of trustees of each school district *shall* adopt a grievance procedure under which the board *shall* address each complaint that the board receives concerning violation of a right guaranteed by this chapter."  *Id.* § 26.011 (emphases added).

        In the present case, Summers complains that LISD violated its policies when it "wrongfully denied the right to present [her] [Level III] grievance to the Board."  Doc. No. 13 at 24–25, ¶ 76. In the midst of her internal grievance procedure, between her Level II and Level III appeals, Summers complained about new matters, such as whether LISD violated its own Policies and provisions of the Texas Education Code.  Ex. 25, Doc. No. 13-3 at 3.  In correspondence with both Assistant Superintendent Shelly Slaton and LISD attorney Wayne Haglund, Summers learned that she needed "to specify exactly which policies and which applicable laws [she] reviewed that apply to this circumstance," and that she "must specifically designate in what ways those school policies and applicable laws were not properly addressed."  Ex. 27, Doc. No. 13-3 at 9; Ex. 21, Doc. No. 13-2 at 34.   Summers contends that such an interpretation violates Texas Education Code § 11.1513(i), which states "[t]he employment policy must provide each school district employee with the right to present grievances to the district board of trustees."  TEX. EDUC. CODE § 11.1513(i).  Throughout the grievance process below, LISD repeated that a failure to specify

exactly which policies and laws it allegedly violated meant that Summers's Level III appeal was "incomplete."  Ex. 27, Doc. No. 13-3 at 9; Ex. 21, Doc. No. 13-2 at 34.

The undersigned is of the opinion that the court lacks jurisdiction to entertain any claim regarding LISD Policies as an independent cause of action because Summers failed to properly exhaust her claims with the School Board or the Commissioner.  The Texas Education Code has provided an exclusive means by which an employee may file a grievance.  TEX. EDUC. CODE § 26.011.  This grievance procedure falls within Title I of the Code, meaning it is a "school law" of the state, and therefore, the Commissioner has exclusive jurisdiction regarding this grievance procedure.  TEX. EDUC. CODE §§ 7.057(a), (f)(2).  Here, Summers amended her grievance in the middle of her initial internal grievance process regarding other employment complaints to include a complaint that LISD was not following its own policies.  Accordingly, Slaton's December 8, 2020 letter to Summers and Reverend McClain stating that her Level III Appeal Notice "must be the subject of a new complaint as it is impossible to add new issues and new complaints to a complaint filed timely months ago" is correct—Summers must administratively exhaust her appeals with both the School Board and Commissioner before filing a complaint in court.  Ex. 25, Doc. No. 13-3 at 3.[18]

As such, regarding Summers's internal grievances relating to LISD's own policies, and as it concerns Summers's failure to receive a Level III Conference, this court lacks subject-matter jurisdiction to entertain these claims because Summers has failed to properly exhaust these complaints below.  Once more, federal courts are not courts of general jurisdiction.  *Kokkonen*,

---

[18] Furthermore, Summers has failed to overcome the presumption that LISD is the interpreter of its own policies.  *Montgomery Indep. Sch. Dist. v. Davis*, 34 S.W.3d 559, 565 (Tex. 2000) (emphasis added) ("Because school boards have 'the exclusive power and duty to govern and oversee the management of the public schools of the district,' TEX. EDUC. CODE § 11.151(b), under the statutory scheme *a school board must be the ultimate interpreter of its policy*, subject to the limits established by the Legislature in its provisions for administrative and judicial review.")

511 U.S. at 377.  Summers's current internal grievances concerning LISD's failure to follow its own policies were not properly exhausted, as she filed essentially a new complaint in the middle of her grievance process.  Moreover, Summers lacks jurisdiction to complain about LISD's failure to provide her a Level III Conference because she neither exhausted this complaint at the Level III stage nor before the Commissioner.  Accordingly, to the extent that Summers alleges LISD Policies as independent causes of action, the court lacks subject-matter jurisdiction to entertain these claims.

### iii.   Chapter 21 of the Texas Labor Code

Summers next alleges causes of action under the Texas Commission Human Rights Act ("TCHRA"), Texas Labor Code Chapter 21, for race discrimination and retaliation against Defendant LISD alone.  *See* Doc. No. 13 at 1, ¶ 2 (suing Superintendent Lynn Torres "individually under Title 42 USCA § 1983" and not the TCHRA), 35, ¶¶ 126–131; TEX. LAB. CODE §§ 21.051 (discrimination), 21.055 (retaliation).  LISD moves to dismiss these employment claims for lack of subject-matter jurisdiction because the Texas Labor Code's statute of limitations and administrative exhaustion requirements preclude Summers from raising these complaints.  Defs.' Mot., Doc. No. 17 at 27 ("Because Texas law provides that Chapter 21's time limits are mandatory and jurisdictional, the Court lacks subject-matter jurisdiction over any of Summers's discrimination or retaliation claims . . . and such claims should be dismissed with prejudice.").  Summers has failed to meaningfully respond to these arguments in her *Response*.  *See generally* Pl.'s Resp., Doc. No. 32.  Here, the undersigned agrees with Defendants.

"Modeled after Title VII, 42 U.S.C. § 2000 *et seq.*, the Texas Labor Code requires those claiming employment discrimination to file an administrative complaint with the [Texas

Workforce Commission or EEOC] [19] before filing an action in court." *Hinkley*, 968 F.3d at 552 (citations omitted).  Texas Labor Code Section 21.202 mandates that "a complaint under this subchapter must be filed not later than the 180th day after the date the alleged unemployment practice occurred." TEX. LAB. CODE §§ 21.202(a).  When an employment action is brought against a governmental entity, this deadline is "mandatory and jurisdictional."[20]  *See* TEX. GOV'T CODE § 311.034 ("Statutory prerequisites to a suit, including the provision of notice, are jurisdictional requirements in all suits against a governmental entity."); *Monte Alto Indep. Sch. Dist. v. Orozco*, No. 1:13-21-00136-CV, 2021 WL 5114040, at *3 (Tex. App.—Corpus Christi-Edingburg Nov. 4, 2021, no pet.) (mem. op.).  "Accordingly, filing a timely charge with the [EEOC] is a jurisdictional prerequisite to filing suit for unlawful employment practices against a school district." *Harlingen Consol. Indep. Sch. Dist. v. Montemayor*, No. 13-22-00014-CV, 2022 WL 3652499, at *3 (Tex. App.—Corpus Christi-Edinburg Aug. 25, 2022, no pet.) (mem. op.); *Monte Alto Indep. Sch. Dist.*, 2021 WL 5114040, at *4 (same).

Importantly, each "discrete act"—instances such as "termination, failure to promote, denial of transfer, or refusal to hire . . . starts a new clock for filing charges alleging that act." *Wernert*

---

[19] Texas created the Texas Commission on Human Rights ("TCHR")—later replaced by the Texas Workforce Commission ("TWC")—as a "deferral agency" so that claims of employment discrimination could first be addressed at the state level. *Vielma v. Eureka Co.*, 218 F.3d 458, 462 (5th Cir. 2000). Many years ago, the TCHR and the EEOC entered a "Worksharing Agreement." *Id.*; *see also Griffin v. City of Dallas*, 26 F.3d 610, 612–13 (5th Cir. 1994) ("[U]pon the EEOC's receipt of the complaint, the TCHR, for all legal and practical purposes, [also] received the complaint."). Accordingly, Summers only needed to file a timely charge with one of the two employment agencies to satisfy this jurisdictional prerequisite.

[20] The court notes that in *Hinkley*, the Fifth Circuit concluded that "Texas Labor Code § 21.202's 180-day filing requirement *is mandatory but not jurisdictional*." *Hinkley*, 968 F.3d at 554 (emphasis added). That case, however, did not present litigation against a government entity, meaning this holding therefore cannot apply to the instant case. *Id.* at 554; *Prairie View A&M Univ. v. Chatha*, 381 S.W.3d 500, 515 (Tex. 2012) (citing TEX. CIV. PRAC. & REM. CODE § 311.034) ("[A] statutory prerequisite to suit, whether administrative (such as filing a charge of discrimination) or procedural (such as timely filing a lawsuit) is jurisdictional when the defendant is a governmental entity."); *see, e.g.*, *Univ. of Tex. at El Paso v. Isaac*, 568 S.W.3d 175, 184 (Tex. App.—El Paso Sept. 19, 2018, pet. denied) (citing *Chatha*, 381 S.W.3d at 511) (concluding that suit against public university was "jurisdictionally barred" pursuant to Government Code 311.034 when plaintiff failed to file employment discrimination suit within Texas Labor Code's statute of limitations); *Neal v. Malakoff Indep. Sch. Dist.*, No. 6:21-CV-001510JCV, 2021 WL 3828698, at *5--6 (E.D. Tex. Aug. 4, 2021), *R. & R. adopted*, No. 6:21-CV-00151, 2021 WL 3824809 (E.D. Tex. Aug. 26, 2021) (applying Texas Labor Code's 180-day statute of limitations in suit against public school district as jurisdictional).

*v. City of Dublin*, 557 S.W.3d 868, 874 (Tex. App.— Eastland 2018, no pet.) (citing *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 114 (2002)) ("Discrete discriminatory acts are not actionable if time-barred, and each discrete discriminatory act starts a new clock for filing charges alleging that act."); *see also Granger v. Tex. Dep't of Transp.*, No. 09-17-00051-CV, 2018 WL 6684364, at *5–*6 (Tex. App.—Beaumont Dec. 20, 2018, no pet.) (mem. op.). "Discrete acts that fall within the statutory time period do not make acts that fall outside the time period timely." *Alief Indep. Sch. Dist. v. Brantley*, 558 S.W.3d 747, 755 (Tex. App.—Houston [14th Dist.] 2018, pet. denied) (citation omitted).

Here, Summers states that she filed her EEOC charge on October 5, 2021. Doc. No. 13 at 4, ¶ 11. Accordingly, Defendants contend that all alleged discriminatory unlawful employment practices that occurred more than 180 days before October 5, 2021 are jurisdictionally barred. Doc. No. 17 at 24; *Chatha*, 381 S.W.3d at 503 (an unlawful employment practice "occur[s] "when a discriminatory employment decision is made—not when the effects of that decision become manifest in later events."); *see also Specialty Retailers, Inc. v. DeMoranville*, 933 S.W.2d 490, 493 (Tex. 1996) (per curiam) (citations omitted) (180-day limitations period in TCHRA starts "when the employee is informed of the allegedly discriminatory employment decision, not when that decision comes to fruition."). The court agrees with Defendants. Accordingly, each discrete act that occurred prior to April 8, 2021 (180 days before October 5, 2021) is jurisdictionally barred, and this court cannot entertain the merits of these claims. *See Wernert*, 557 S.W.3d at 874 (internal parenthetical in original) ("[I]f a plaintiff filed his first EEOC Charge on September 28, 2012, any claim regarding discrete discriminatory acts occurring before April 1, 2012 (180 days before the EEOC Charge was filed) would be untimely.").

Second, Defendants assert that Summers's operative *Complaint* (Doc. No. 13) contains several allegations that post-date Summers's EEOC Charge. Doc. No. 17 at 25. Accordingly, Defendants similarly argue that this court lacks jurisdiction because Summers failed to administratively exhaust her claims before filing her *Complaint* with this court.

"The failure to exhaust administrative remedies is a jurisdictional defect which deprives the courts of subject matter jurisdiction." *Univ. of Tex. at El Paso v. Isaac*, 568 S.W.3d 175, 181 (Tex. App.—El Paso Sept. 19, 2018, pet. denied) (collecting cases). "In pursuing a claim, the TCHRA requires that the claimant file a sworn, written complaint with the [EEOC] within 180 days of the alleged discriminatory act." *Id.* (footnotes and citations omitted). However, Section 2.201(f) allows a claimant to amend their EEOC Charge if they would like to provide "additional facts that constitute unlawful employment practices relating to or arising from the subject matter of the original complaint." TEX. LAB. CODE § 21.201(f); *Isaac*, 568 S.W.3d at 181. Such an amended complaint relates back to the date of the complaint first received by the EEOC. TEX. LAB. CODE § 21.201(f); *Isaac*, 568 S.W.3d at 181 (citations omitted).

On January 26, 2022, Summers filed her *Original Petition and Jury Demand* (Cause No. CV-00047-22-01) in state court, and on June 20, 2022, Summers filed her operative *First Amended Complaint* (Doc. No. 13). Ex. 2, Doc. No. 1-2 at 8; Doc. No. 2. Summers's *First Amended Complaint*, however, raises claims that have occurred since she filed her original *Complaint* in state court. *Compare* Doc. No. 13 at 26–27, ¶¶ 85 (complaint regarding Summers's attire at work) ¶ 86 (Summers's alleged false statement to a parent) *with* Original Compl., Doc. No. 2. Absent in her *First Amended Complaint* is any mention that she exhausted these allegations between January 2022 and June 2022 with the EEOC. *See generally* Doc. No. 13. Accordingly, Summers has failed

to satisfy her burden that this court has subject-matter jurisdiction to entertain these claims because they are properly exhausted.  *Kokkonen*, 511 U.S. at 377.

a.  <u>Adverse Employment Action</u>[21]

As a result of Summers's failures to satisfy the TCHRA's statute of limitations and administrative exhaustion requirements, the only pending allegation properly before this court is Summers's complaint regarding receiving "3's" in her 2020–21 performance evaluation.  Doc. No. 13 at 8, ¶ 17(c)(iii), 25 ¶¶ 17(c)(ii)–(v), 79.  This, however, is not an adverse employment action within the meaning of the TCHRA for her claims of employment discrimination.  *See Ezparza v. Univ. of Tex. at El Paso*, 471 S.W.3d 903, 909 (Tex. App.—El Paso 2016, no pet.) (emphasis added) (citations omitted) ("[A]n adverse employment action requires a significant change in employment status . . . events such as disciplinary filings, reprimands, *poor performance reviews, negative employment evaluations*, verbal threats to hire, and criticism of the employee's work do not constitute actionable adverse employment decisions.").

However, "[r]etaliation claims can be actionable under the TCHRA even if the underlying discrimination claim is not."  *Alamo Heights Indep. Sch. Dist. v. Clark*, 544 S.W.3d 755, 782 (Tex. 2018).  To establish a prima facie case for retaliation under the TCHRA, Summers must show: "(1) she engaged in activity protected by the TCHRA; (2) she experienced a material adverse employment action, and (3) a causal link exists between the protected activity and the adverse employment action."  *Id.* at 782.  Filing an internal complaint is protected activity under the TCHRA.  *Id.* at 786.  Second, a material adverse employment action is one that is "likely to deter discrimination victims from complaining" —"[p]etty slights, minor annoyances, and simple lack

---

[21] For convenience, the court will analyze the merits of the only live employment claim that this court has proper jurisdiction to entertain, rather than discuss it below in this report's analysis of the merits of Summers's claims.

of good manners typically will not create such deterrence." *Metro. Transit Auth. of Harris Cnty. v. Douglas*, 651 S.W.3d 122, 138 (Tex. App.—Houston [14th Dist.] 2021, no pet.) [hereinafter, "*Douglas II*"] (citation omitted).   A lower performance evaluation *may* constitute a material adverse employment action.  *See id.*

In *Douglas*, the Houston Court of Appeals for the Fourteenth District held that a lowered performance evaluation constituted a material adverse employment action because it would likely deter discrimination victims from complaining when the Chief of the Police Department:  (1) pressured supervisors to lower an employee's evaluation "without justification," (2) struck back against a supervisor who failed to do so, and (3) told those supervisors not to trust the employee and to "look for reasons to reprimand them." *Id.*  Moreover, the employee "listed by name several other officers who told her they were leery of complaining because of what had happened to her." *Id.*

A material adverse employment action is an "objective standard . . . because the significance of any given act of retaliation will often depend upon the particular circumstances. Context matters." *Metro. Transit Auth. of Harris Cnty. v. Douglas*, 544 S.W.3d 486, 494 (Tex. App.—Houston [14th Dist.] 2018, pet. denied) [hereinafter, "*Douglas I*"] (providing nonexhaustive list of factors to consider for when an action is materially adverse, such as the act's effect on the employee's prestige, opportunity for advancement, pay, their "core job duties," and their ability to obtain outside employment).

Here, the court is of the opinion that a lowered performance evaluation alone, and one that was later partially amended, cannot constitute a material adverse employment action.  Ex. 11, Doc. No. 13-2 at 21 (changing sub-score of Summers's evaluation to a "4" from a "3" as she requested).

This case starkly differs from the context laid out in *Douglas II*.  Summers filed her internal grievance on July 22, 2020, and her lowered performance evaluation occurred in May 2021.  Doc. No. 13 at 24–25, ¶¶ 74 (grievance), 79 (performance evaluation).  In the interim, Summers did not allege that her supervisors took this action "without justification," retaliated against Gabriela Murphy for failing to lower her evaluation, or expressed anger or disapproval when Murphy amended her evaluation, or that her supervisors were looking for further reasons to reprimand her. Nor did Summers allege any of the *Douglas I* factors, except an unadorned and vague assertion further down in her *Complaint* that her reputation suffered.  Doc. No. 13 at 34, ¶ 122.  The court will not entertain that unsupported assertion at this juncture.  *Iqbal*, 556 U.S. at 678 ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice.").

While the court acknowledges that "[t]he presence or absence of any of [the *Douglas I*] factors is not dispositive because the effect of a challenged action must be considered as a whole in light of all the circumstances," Summers has failed to allege how she has experienced such an adverse action that other coworkers would be deterred from filing internal grievances.  *Douglas I*, 544 S.W.3d at 494.  Further, unlike the supervisors in *Douglas I*, Summers's supervisor Gabriela Murphy actually reconsidered her score, separate from the internal grievance proceedings, and changed her "3" to a "4" for a sub-section of her evaluation.  Ex. 11, Doc. No. 13-2 at 21.  In short, "[c]ontext matters" and without allegations of how this evaluation affected her career or dissuaded another worker from filing a complaint, this stand-alone allegation cannot satisfy the bar for the retaliation standard.  *Douglas I*, 544 S.W.3d at 494, 495 (holding that "[a] downgrade of an employee's performance evaluation . . . might have dissuaded a reasonable worker from making

or supporting a charge of discrimination" because an employee's "prestige" and opportunities for advancement were hindered shortly after she filed her discrimination complaint).[22]

In sum, the court recommends dismissing all of Summers's instant employment discrimination and retaliation claims brought pursuant to Chapter 21 of the Texas Labor Code for lack of subject-matter jurisdiction. Summers either lacks standing to bring her claims, or she has failed to satisfy the TCHRA's jurisdictional and mandatory prerequisites in failing to satisfy the TCHRA's statute of limitations and administrative exhaustion requirements. Finally, Summers's only live claim that is properly before this court is not an adverse employment action for either discrimination or retaliation purposes. Accordingly, the undersigned recommends granting Defendant's instant *Motion to Dismiss* (Doc. No. 17) as it pertains to all of Summers's Texas Labor Code and LISD Policy-related claims. The court will next proceed to Summers's Section 1983 claims.

## C. 42 U.S.C. Section 1983

Lastly, the court addresses Summers's claims brought forth under 42 U.S.C. § 1983 against both LISD and Superintendent Torres. In the operative *Complaint* (Doc. No. 13), Williams alleges LISD and Torres are liable under 42 U.S.C. § 1983 for violating: (1) her Fourteenth Amendment

---

[22] Moreover, even if the lowered performance evaluation adequately constituted a material adverse employment action, Summers decidedly cannot survive a challenge to causation because she has failed to show a "causal nexus" between her internal grievance and her lowered evaluation. *Douglas II*, 651 S.W.3d at 139. Summers has alleged that she filed an internal grievance in July 2020, and then received her evaluation in May 2021. "Retaliation claims are subject to a traditional 'but for' measure of causation, i.e., the plaintiff must show that she would not have suffered an adverse employment action but for engaging in protected activity." *Id.* (citation omitted). "An employer's knowledge of a complaint, standing alone, is insufficient to demonstrate the required causal link in a prima facie retaliation case." *Id.* (citation omitted).

Here, Summers has not alleged any causal nexus to satisfy the third element of causation. Indeed, she has not even alleged that LISD's knowledge of her internal grievance as evidence of causation but-for retaliation. Nor can Summers rely on temporal proximity, as she received a lower performance evaluation nearly one year after filing her internal grievance. *See Alamo Heights*, 544 S.W.3d at 790 (footnote and citation omitted) ("Eight months passed between the EEOC charge and Principal Kershner's termination recommendation. That gap is so long as to be of little, if any, probative value.").

rights under the Due Process Clause; and (2) Defendants' retaliation against her in violation of her First Amendment right to free speech.  Doc. No. 13 at 22, 34, ¶¶ 69, 121, 124.  In their *Motion to Dismiss* (Doc. No. 17), Defendant LISD moves to dismiss Summers's claims against it for failing to state a claim for municipal liability under the doctrine set forth in *Monell v. New York City Department of Social Services*.  436 U.S. 658 (1978); *see generally* Doc. No. 17 at 16–20. Alternatively, Defendant Torres raises the defense of qualified immunity to Summers's Section 1983 allegations.

Title 42 U.S.C. Section 1983 provides in pertinent part:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . .

42 U.S.C. § 1983 (2018).

It is well-established that school districts are deemed "persons" susceptible to suit under Section 1983.  *Monell v. Dep't of Soc. Servs. of City of N.Y.*, 436 U.S. 658, 690 (1978) (internal footnote omitted) ("Local governing bodies, [] therefore, can be sued directly under § 1983 . . . where, as here, the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers."); *Littell v. Hous. Indep. Sch. Dist.*, 894 F.3d 616, 622 (5th Cir. 2018) (citing *Monell*, 436 U.S. at 690) ("[M]unicipal entities like the school district qualify as 'persons.'"); *Moore v. Willis Indep. Sch. Dist.*, 233 F.3d 871, 874 (5th Cir. 2000) (citing *Monell*, 436 U.S. 658) ("A local entity, such as a school district, may be held liable under § 1983 for constitutional violations committed pursuant to a governmental policy or custom.").

"To state a section 1983 claim, 'a plaintiff must (1) allege a violation of a right secured by the Constitution or laws of the United States and (2) demonstrate that the alleged deprivation was committed by a person acting under color of state law.'" *James v. Tex. Collin Cnty.*, 535 F.3d 365, 373 (5th Cir. 2008) (quoting *Moore*, 233 F.3d at 874).

Importantly, LISD *cannot* be liable for civil rights violations under a theory of *respondeat superior* or vicarious liability.  *Monell*, 436 U.S. at 691; *Littell*, 894 F.3d at 622 (emphasis in original) (internal citations omitted) (quoting *Monell*, 436 U.S. at 690) ("But the school district 'cannot be held liable under § 1983 on a *respondeat superior* theory.' [ ] Rather, the school district *itself* must have caused the violation."); *Barrow v. Greenville Indep. Sch. Dist.*, 480 F.3d 377, 380 (5th Cir. 2007) ("A school district has no vicarious liability under § 1983.").

Instead, there *must* be an underlying constitutional violation to impose liability on a municipality.  *Baughman v. Hickman*, 935 F.3d 302, 311 (5th Cir. 2019); *Doe ex rel. Magee v. Covington Cnty. Sch. Dist. ex rel. Keys*, 675 F.3d 849, 866–67 (5th Cir. 2012) (internal citations omitted) ("We have stated time and again that '[w]ithout an underlying constitutional violation, an essential element of municipal liability is missing.'"); *see also Collins v. City of Harker Heights, Tex.*, 503 U.S. 115, 120 (1992) ("[P]roper analysis requires us to separate two different issues when a § 1983 claim is asserted against a municipality: (1) whether plaintiff's harm was caused by a constitutional violation, and (2) if so, whether the city is responsible for that violation.").

As alleged against Superintendent Torres, however, section 1983 analysis differs.  Here, Torres raised the affirmative defense of qualified immunity.  Doc. No. 17 at 21–23.  This defense has two prongs, both of which must be rebutted to overcome qualified immunity:  (1) "whether an official's conduct violated a constitutional right of the plaintiff"; and (2) "whether the right was clearly established at the time of the violation."  *Luna v. Davis*, 59 F.4th 713, 715 (5th Cir. 2023)

(quoting *Brown v. Callahan*, 623 F.3d 249, 253 (5th Cir. 2010)); *Peterson v. Johnson*, 57 F.4th 225, 232 (5th Cir. 2023) (same).  "This two-step inquiry, however, is not mandatory."  *Longoria Next Friend of M.L. v. San Benito Indep. Consol. Sch. Dist.*, 942 F.3d 258, 264 (5th Cir. 2019).

In *Pearson v. Callahan*, the Supreme Court held that district court judges have discretion "in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand."  *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).  In dicta, the *Pearson* Court advised lower courts to consider tackling constitutional questions because:  (1) "[i]t often may be difficult to decide whether a right is clearly established without deciding precisely what the existing constitutional right happens to be"; and (2) resolving the merits of constitutional questions "promotes the development of constitutional precedent and is especially valuable with respect to questions that do not frequently arise in cases in which a qualified immunity defense is available."  *Id.* at 236 (internal citation and quotation marks omitted).

Thus, because *Monell* liability *requires* this court to analyze underlying constitutional violations, *Magee*, 675 F.3d at 866–67, and for the reasons provided by the *Pearson* Court to nonetheless answer these constitutional questions in undergoing a qualified immunity analysis, the undersigned will address Summers's underlying constitutional violations below.

i.      *Substantive and Procedural Due Process Claims*

The court begins its assessment of Summers's due process claims by noting that Summers's allegations are incredibly unclear.

First, throughout Summers's *Complaint*, she begins paragraphs thirty-four (34), forty-nine (49), fifty (50), fifty-four (54), sixty-one (61), sixty-three (63), and sixty-seven (67) through

seventy-five (75) with the introductory phrase "Due Process and *Doyle*."[23]  Doc. No. 13 at 17–18, 20–24, ¶¶ 49, 50, 54, 61, 63, 67–75.  First, not only is this introductory phrase a conclusory statement, such that the court must disregard it, *Iqbal*, 556 U.S. at 678, but the *Doyle* case is inapposite to the present matter.  *Doyle* dealt with a school board's nonrenewal of a teacher's contract, allegedly in violation of his First and Fourteenth Amendment rights—*not* his Fourteenth Amendment due process rights.  *See Doyle*, 429 U.S. at 283 (reviewing district court's ruling that "Doyle's telephone call to the radio station was 'clearly protected by the First Amendment,' and that because it had played a 'substantial part' in the decision of the Board not to renew Doyle's employment, he was entitled to reinstatement with backpay.").[24]  Accordingly, these previously mentioned paragraphs fail to properly allege any due process violations.

Likely relying on Summers's introductory phrases that contain the words "Due Process," Defendants construe Summers's *Complaint* as alleging a fundamental right to:  promotions, attend conferences and educational trips, publicize advertisements and fliers, and comply with internal policies and procedures.  Doc. No. 17 at 13–14.  While Defendants' interpretation of Summers's *Complaint* is comprehensive, the court simply cannot find due process allegations merely where Summers provided this introductory phrase.  To do so would contravene the Supreme Court's commands in *Iqbal* and *Twombly* and allow for Summers to plead conclusory statements.  *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 555) ("Threadbare recitals of the elements of a cause

---

[23] On page thirty-one (31) of the instant *Complaint*, in a footnote, Summers cites to the case *Mt. Healthy City School District v. Doyle*, 429 U.S. 274 (1977).  The undersigned understands the following introductions, "Due Process and *Doyle*" to therefore refer to this case.

[24] Furthermore, the *Doyle* decision did not address any school board policies under *Monell*, and indeed, the Supreme Court vacated the judgment of the Court of Appeals and the District Court, which held that Doyle's nonrenewal violated his First Amendment rights.  *Doyle*, 429 U.S. at 284 ("There is no suggestion by the Board that Doyle violated any established policy . . ."), 287 (vacating and remanding case for further proceedings).  This case therefore only stands for the limited proposition that a teacher's phone call to a radio station (complaining about a new school-wide dress code policy) is protected speech.  *See id.* at 284 ("We therefore accept the District Court's finding that the communication was protected by the First and Fourteenth Amendments.").  This case does not, however, impact any area of substantive or procedural due process.

of action, supported by mere conclusory statements, do not suffice."); *Twombly*, 550 U.S. at 555 (emphasis added) ("[A] plaintiff's obligation to provide the 'grounds' of [her] 'entitlement to relief' requires *more than labels and conclusions*").  Accordingly, these previously mentioned paragraphs fail to properly allege any due process violations.

More on point to her substantive due process claims, Summers's operative *Complaint* states, in part:

> In sum, **while Plaintiff has no legal right to career promotions** or raises by Defendants, **she has a fundamental right** not to be denied an equal and fair opportunity to seek and obtain career opportunities, **promotions** and benefits as White or Hispanics, or sycophants of Torres who are not more qualified than Plaintiff.

Doc. No. 13 at 33, ¶ 118 (emphases added).

Notwithstanding that this allegation presents a clear inherent contradiction, the court will only construe this allegation as presenting that Summers has a fundamental right to obtain career opportunities, such as promotions.[25]

As such, the court will construe Summers's *Complaint* as only alleging that Defendants violated her fundamental rights to: (1) seek and obtain career opportunities such as promotions; and (2) proceed with her internal grievances in accordance with LISD policies, untampered by

---

[25] To the extent that this statement seeks relief pursuant to § 1983 for LISD's alleged violations under Chapter 21 of the Texas Labor Code, this must fail because § 1983 cannot be used to enforce rights under statutes with their own specific remedial schemes. *Johnston v. Harris Cnty. Flood Control Dist.*, 869 F.2d 1565, 1574 (5th Cir. 1989) (citations omitted) ("Title VII is the exclusive remedy for a violation of the terms of Title VII. . . . Section 1983, however, is not an available remedy for the deprivation of a statutory right when the statute itself provides an exclusive remedy for violations of its own terms.").

Furthermore, to the extent that Summers intended this as an additional Equal Protection Clause allegation, as Defendants briefed, the court will not entertain this nonexistent claim as it is not pleaded or mentioned anywhere in Summers's *Complaint*.  *Cf.* Fed. R. Civ. P. 8(a)(2) (requiring a "short and plain statement of the claim showing that the pleader is entitled to relief").

Lastly, the court notes that it is unknown what Summers is referring to when she states an inability to receive "benefits."  Because this is vague and haphazardly thrown at the end of her allegation, the court will not consider "benefits" in the analysis below.

alleged "fixers" who alter job requirements and qualifications and allegedly biased interview panelists.  Doc. No. 13 at 21–22, 33, ¶¶ 68–69, 119.  Summers has failed to satisfy her burden and show that these are protected liberty or property interests in the first instance.

The Due Process Clause of the Fourteenth Amendment provides that no state shall "deprive any person of life, liberty or property, without due process of law."  U.S. CONST. amend. XIV, § 1. "To state a cause of action under § 1983 for violation of the Due Process Clause, [Summers] must show that she asserted a recognized liberty or property interest within the purview of the Fourteenth Amendment, and that [she] was intentionally or recklessly deprived of that interest, even temporarily, under color of state law."  *Doe v. San Antonio Indep. Sch. Dist.*, 197 F. App'x 296, 299 (5th Cir. 2006) (internal citation and quotation marks omitted); *Doe v. Taylor Indep. Sch. Dist.*, 15 F.3d 443, 450 (5th Cir. 1994).  Accordingly, Summers must first establish a liberty or property interest protected by the Fourteenth Amendment in LISD's alleged failures to promote her and provide her with an "unbiased" and "unfixed" internal grievance process according to their own policies.  *Taylor Indep. Sch. Dist.*, 15 F.3d at 450; *Blackburn v. City of Marshall*, 42 F.3d 925, 935 (5th Cir. 1995) (a plaintiff must "first identify a life, liberty, or property interest protected by the Fourteenth Amendment").

In the public employment context, "[a] constitutionally protected liberty interest is implicated *only if* an employee is discharged in a manner that creates a false and defamatory impression about [her] and thus stigmatizes [her] and forecloses [her] from other employment opportunities."  *Sims v. City of Madisonville*, 894 F.3d 632, 642 (5th Cir. 2018) (per curiam) (emphasis added) (quoting *White v. Thomas*, 660 F.2d 680, 684 (5th Cir. 1981)).  Summers does not allege that LISD discharged her employment, and indeed, in her *Response*, it appears she only alleges deprivation of a property interest.  Doc. No. 32 at 32.  The undersigned will therefore only

analyze whether Summers has a property interest protected by the Fourteenth Amendment to (1) an "equal and fair opportunity to seek and obtain career opportunities" and promotions, and (2) an "unbiased" and "unfixed" internal grievance process.  Doc. No. 13 at 33, ¶ 118.  The court is of the opinion that there are no protected property interests to either alleged right.

Under the Due Process Clause, a protected property interest stems from either the Constitution or state law.  *Wigginton v. Jones*, 964 F.3d 329, 336 n.6 (5th Cir. 2020) (citation omitted) ("[T]his circuit has held that substantive due process rights can be derived from state law, and are therefore treated in the same manner as rights that give rise to a procedural due process claim.").  "Public employees must demonstrate a property right founded on a 'legitimate claim of entitlement' based on 'mutually explicit understandings.'"  *Spuler v. Pickar*, 958 F.2d 103, 106, 107–08 (5th Cir. 1992) (citations omitted) (holding no recognized property right for an assistant professor to achieve tenure).

First, state law forecloses the possibility that Summers has a property interest in receiving promotions.  *Spuler*, 958 F.2d at 106 (citation omitted) ("The nature of Spuler's claim of property right must be determined by reference to Texas law."); *San Benito Consol. ISD v. Leal*, No. 13-20-00569-CV, 2022 WL 243725, at *8 (Tex. App.—Corpus Christi-Edinburg Jan. 27, 2022, no pet.) (collecting cases) (holding that school administrator "did not have a vested property right in being promoted to principal" when school district denied her four promotions that she applied for, even though administrator alleged those selected candidates "were not as qualified as her"); *City of Round Rock v. Whiteaker*, 241 S.W.3d 609, 625 (Tex. App.—Austin 2007, pet. denied) [(op. on reh'g)] (holding that one's placement on a promotion eligibility list "does not create an equitable property interest in promotion"); *Pruitt v. City of Hous.*, 548 S.W.2d 90, 94 (Tex. App.—Houston [1st Dist.] 1977, no pet.) ("Mr. Pruitt had no vested property right in the position

he seeks and no statutory right to judicial review, so due process does not give him an inherent

right to judicial review.").

The court next turns to language from the seminal case *Board of Regents of State Colleges*

*v. Roth*, which states, in part:

> To have a property interest in a benefit, a person clearly must have more than an
> abstract need or desire for it. [She] must have more than a unilateral expectation of
> it. [She] must, instead, have a legitimate claim of entitlement to it. It is a purpose
> of the ancient institution of property to protect those claims upon which people rely
> in their daily lives, reliance that must not be arbitrarily undermined. . . .
>
> Property interests . . . are created and their dimensions are defined by existing rules
> or understandings that stem from an independent source such as state law—rules or
> understandings that secure certain benefits and that support claims of entitlement
> to those benefits.

*Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 577 (1972).

Summers has therefore failed to show she has a property interest in "an equal and fair

opportunity to seek and obtain career opportunities" and promotions.  Doc. No. 13 at 33, ¶ 118.

Indeed, Summers has attached multiple excerpts from LISD's own policies, but first, these policies

do not constitute "state law," and second, the policies are devoid of any mention that their

employees have a right to receive promotions or career advancement.  *See, e.g.*, *Roth*, 408 U.S. at

577 (emphasis added) ("Thus, the welfare recipients in Goldberg v. Kelly, supra, had a claim of

entitlement to welfare payments *that was grounded in the statute defining eligibility for them*.").

Unlike public college professors and staff members who may have contracts that confer "interests

in continued employment," a public employee has no entitlement or expectation of receiving a

promotion.  *See Curtis v. Univ. of Hous.*, 940 F. Supp. 1070, 1078 (S.D. Tex. 1996) (emphasis

added) ("Curtis claims that the college and university faculty handbooks gave him the future

expectation of a property right in a position as a full professor. . . . *Although Curtis has a property*

*interest in his status as a tenured associate professor, he has no property right to the promotion*."),

53

*aff'd*, 127 F.3d 35 (5th Cir. 1997).  Accordingly, Summers has failed to satisfy her burden in showing she has a legitimate property interest under the Fourteenth Amendment to obtain the career opportunities of her choice, such as promotions and other career advancement.  The undersigned will next address her claim to a fundamental right to receiving a fair internal grievance.

Second, Summers contends that LISD has an unwritten policy of "*fixing* the requirements" or adding "ad hoc job qualifications or preferences for job positions to justify and facilitate the rejection of qualified African American candidates."  Doc. No. 13 at 21–22, ¶ 68 (emphasis in original).  Here, it appears Summers has skipped the underlying constitutional requirement for *Monell* liability, and only addressed *Monell*'s policy requirement.  *E.g.*, *Balle v. Nueces Cnty., Tex.*, 952 F.3d 552, 558 (5th Cir. 2017) (internal citation and quotation marks omitted) ("To establish municipal liability under § 1983, a plaintiff must show that (1) an official policy (2) promulgated by the municipal policymaker (3) was the moving force behind the violation of a constitutional right.").  However, as previously stated, there *must* be an underlying constitutional violation to impose liability on LISD.  *Baughman*, 935 F.3d at 311.

In support of her arguments, Summers principally relies on the case *Burnaman v. Bay City Independent School District* from the Southern District of Texas.  *See* Pl.'s Resp., Doc. No. 32 at 34–40 (citing *Burnaman v. Bay City Indep. Sch. Dist.*, 445 F. Supp. 927 (S.D. Tex. 1978)).  In *Burnaman*, a teacher, and later, vocational counselor, received an unfavorable evaluation and written notification that his contract would not be renewed.  *Burnaman*, 445 F. Supp. At 929–30.  Before this evaluation, Burnaman received "commendable" written evaluations and "continued to have the respect and confidence of his superiors as he had had for many years."  *Id.* at 930.  Burnaman therefore requested a hearing for several months, but the school board ignored his

request and failed to provide him with an opportunity to refute his poor performance evaluation. *Id.* at 931.

There, the court held that under *Roth*, Burnaman had a legitimate property interest in his job, and the school board therefore deprived him of this interest when it failed to renew his contract. *Id.* at 936–37. Accordingly, Summers cites to *Burnaman*'s main proposition that "[f]ailure of the Government to follow its own duly promulgated rules and published policies violates a citizen's right to procedural due process." *Id.* at 937. While this proposition may be true, Summers's own admissions that "Defendants did not terminate, nonrenew, or demote Summers" is fatal to her case here. Doc. No. 32 at 38.

Here, Summers complains that LISD "fixed" job requirements and "alter[ed] Interview Board[] procedures to rig implant [sic] favorable panelists." Doc. No. 13 at 22, ¶ 69. Thus, Summers contends, LISD failed to comply with its own internal policies, particularly in precluding Summers from presenting her Level III grievance. The issue is that Summers has failed to show that either the Constitution or Texas law has provided her with a property interest to her grievance or to a fair and impartial interview board. Unlike *Burnaman*, Summers has not lost her job, she has only failed to receive the career placements of her choice. Thus, *Burnaman*'s central proposition regarding a school district's compliance with its own policies simply cannot apply if a property interest is not at stake, and as previously discussed, the failure to receive a promotion or equal opportunity to career advancement is not a recognized property interest. *See supra*.[26]

---

[26] To take another example, *Burnaman*'s central proposition cites to *Vitarelli v. Seaton* in support of the contention that the Government must follow its own policies. *Burnaman*, 445 F. Supp. at 936 (citing *Vitarelli v. Seaton*, 359 U.S. 535 (1959)). Even in *Vitarelli*, however, an educator received a letter suspending him without pay for his alleged association with the Communist Party. *Vitarelli*, 359 U.S. at 536. The educator "failed to obtain reinstatement" and then brought suit. *Id.* at 537. This only further underscores the instant case, as LISD has not deprived Summers of the property interests incurred in either *Burnaman* or *Vitarelli*.

As such, the court recommends granting Defendants *Motion to Dismiss* (Doc. No. 17) as it pertains to Summers's substantive due process claims.  Moreover, because Summers must still show that she has suffered a liberty or property interest to move forward on her procedural due process claims, the undersigned recommends dismissal of this claim as well.  *Ross v. Judson Indep. Sch. Dist.*, 993 F.3d 315, 324 (5th Cir. 2021), *cert. denied*, 142 S. Ct. 216 (2021) (emphasis added) (citation omitted) ("To establish *a procedural due process claim* under § 1983, Ross must identify a protected property or liberty interest and then show that [the school district's] actions resulted in a deprivation of that interest.").  The court will next address Summers's claims brought under the First Amendment.

### ii.    *First Amendment: Free Speech Retaliation*

Finally, while not explicitly alleged, it appears that Summers also brings a claim for Free Speech retaliation brought under the First Amendment.  *See* Doc. No. 13 at 22, 34, ¶¶ 69 ("LISD under Torres has gone to the extreme of tampering with the make-up of Interview Boards, and/or altering Interview Board's [sic] procedures . . . because of race and exercise of protected speech"), 124 ("The retaliatory acts of Defendants have been substantially motivated by Plaintiff's exercises of protected speech which spanned and have continued since 2019."), 125 ("But for Plaintiff's exercises of protected speech, Plaintiff would not have been subjected to Defendant[s'] retaliatory acts.").

Once more, Summers's *Complaint* is again unclear for exactly *which* speech Defendants allegedly retaliated against her.  Doc. No. 17 at 14 ("[T]he Amended Complaint is incredibly unclear with respect to what specific speech allegedly motivated what retaliatory act . . .").  Nevertheless, because Summers's *Complaint* is confined to matters that occurred in her capacity as an employee rather than as her capacity as citizen on a matter of public concern, such as

Summers's complaints regarding the internal grievance process, Summers's *Complaint* should be dismissed on this ground as well.

To establish a § 1983 claim based on a violation of the First Amendment right to free speech, a plaintiff must show that:  (1) she suffered an adverse employment action; (2) she spoke as a citizen on a matter of public concern; (3) her interest in her speech outweighs the government's interest in the efficient provision of public services; and (4) the speech precipitated the adverse employment action.  *Bevill v. Fletcher*, 26 F.4th 270, 276 (5th Cir. 2022).  Summers satisfies the first element because she alleges that LISD failed to promote her.  *Anderson v. Valdez*, 845 F.3d 580, 590 n.20 (5th Cir. 2016) (emphasis added) (citation and quotation marks omitted) ("Adverse employment actions are discharges, demotions, refusals to hire, *refusals to promote*, and reprimands."); *Harrington v. Harris*, 118 F.3d 359, 365 (5th Cir. 1997) (same).

However, Summers has failed to show that she spoke as a citizen on a matter of public concern for *any* speech she allegedly made throughout her *Complaint*.  "When public employees engage in speech pursuant to their official duties, they 'are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline.'"  *Harmon v. Dallas Cnty., Tex.*, 927 F.3d 884, 893 (5th Cir. 2019) (citing *Garcetti v. Ceballas*, 547 U.S. 410, 417 (2006)).  This is because "[w]hen a citizen enters government service, the citizen by necessity must accept certain limitations on his or her freedom."  *Garcetti*, 547 U.S. at 418 (citation omitted).  In *Lane v. Franks*, the Supreme Court emphasized that "[t]he critical question under *Garcetti* is whether the speech at issue is itself ordinarily within the scope of an employee's duties, not whether it merely concerns those duties."  *Lane v. Franks*, 573 U.S. 228, 240 (2014).  Thus, if a public employee speaks "'pursuant to [her] official duties,'" then "the

speech is not protected under the First Amendment." *Bevill*, 26 F.4th at 276 (quoting *Garcetti*, 547 U.S. at 421).

First, the Fifth Circuit has long held that the filing of an internal grievance clearly constitutes only a matter of personal interest rather than a matter of public concern. *See Wright v. Arlington Indep. Sch. Dist.*, 834 F. App'x 897, 903 (5th Cir. 2020) (per curiam) (citation omitted) ("Wright has failed to make a facially plausible showing that she spoke on a matter of public concern. Instead, her allegations related to internal workplace grievances that affect Wright 'in a purely personal manner' and are thus not constitutionally protected."); *Rathjen v. Litchfield*, 878 F.2d 836, 837–38, 842 (5th Cir. 1989) (not a matter of public concern where city service employee filed internal grievances over poor performance evaluations, resulting in her layoff, because this was only a matter of personal interest); *Day v. S. Park Indep. Sch. Dist.*, 768 F.2d 696, 697 (5th Cir. 1985) ("[H]er actions, whether viewed as speech, petitioning, or both, related only to her superior's employment decisions that affected her in a purely personal manner not to matters of political, social, or community concern."); *id.* at 701 (internal footnotes and citations omitted) ("As a matter of law, therefore, Day's complaint about her individual teaching evaluation and the principal's explanation of it is not protected speech under the first amendment."). This forecloses any argument by Summers that her internal grievances constitute matters of public concern.

Nor can Summers plausibly state a claim that *any* of the alleged speech in her *Complaint* is regarding a matter of public concern, rather than a matter of personal interest, made in her personal capacity, rather than within the scope of her duties as a school employee. To the extent that her *Complaint* does contain speech on a matter of public concern, Summers has failed to state specific facts alleging as such. *Fee v. Herndon*, 900 F.2d 804, 807 (5th Cir. 1990) (citations omitted) ("A section 1983 complaint must state specific facts, not simply legal and constitutional

conclusions.").  Therefore, the undersigned recommends granting Defendants' *Motion to Dismiss* (Doc. No. 17) for Summers's First Amendment claim as well.

In sum, Summers's *First Amended Complaint* (Doc. No. 13) is fatally deficient, both as a basis for establishing subject-matter jurisdiction, and to plausibly state a claim upon which relief may be granted.  The undersigned therefore recommends granting the instant *Motion to Dismiss* (Doc. No. 17), and accordingly, denying Defendants' pending *Motion to Compel Discovery from Plaintiff* (Doc. No. 37) as moot.

The court concludes this report by noting that it is clear in many, if not all, places of the operative *Complaint* that Plaintiff's counsel has merely copied and pasted from Summers's internal grievances, essentially filing her grievances as a *Complaint* in federal court.  Plaintiff's counsel is therefore reminded that federal courts are not courts of general jurisdiction, that the plaintiff bears the burden at all times to prove that federal courts have proper jurisdiction, and that the plausibility standard set forth under *Iqbal* and *Twombly* require more than labels, conclusions, and threadbare recitals of law.  This *Complaint* is riddled with such basic pleading deficiencies that are fatal to Summers's *Complaint*.  Moreover, the undersigned admonishes Plaintiff's counsel that not every slight or minor annoyance rises to the level of an adverse employment action or a constitutional claim.

### I.    <u>Recommendation</u>

For the reasons stated above, the undersigned recommends granting Defendants Lufkin Independent School District and Superintendent Lynn Torres's *Motion to Dismiss Plaintiff's First Amended Complaint* (Doc. No. 17).  Because this case should be dismissed, the court also

recommends denying Defendants *Motion to Compel Discovery from Plaintiff* (Doc. No. 37) as moot.

## II.    <u>**Objections**</u>

Pursuant to 28 U.S.C. § 636(b)(1)(C), each party to this action has the right to file objections to this Report and Recommendation.  Objections to this Report must (1) be in writing, (2) specifically identify those findings or recommendations to which the party objects, (3) be served and filed within fourteen (14) days after being served with a copy of this Report, and (4) <u>**be no more than eight (8) pages in length**</u>.  *See* 28 U.S.C. § 636(b)(1)(C); FED. R. CIV. P. 72(b)(2); E.D. TEX. CIV. R. CV-72(c) (emphasis added).  A party who objects to this Report is entitled to a *de novo* determination by the United States District Judge of those proposed findings and recommendations to which a specific objection is timely made.  28 U.S.C. § 636(b)(1)(C); FED. R. CIV. P. 72(b)(3).

A party's failure to file specific, written objections to the proposed findings of fact and conclusions of law contained in this Report, within fourteen (14) days of being served with a copy of this Report, bars that party from: (1) entitlement to *de novo* review by the United States District Judge of the findings of fact and conclusions of law, and (2) appellate review, except on grounds of plain error, of any such findings of fact and conclusions of law accepted by the United States District Judge.  *See Rodriguez v. Bowen*, 857 F.2d 275, 276-77 (5th Cir. 1988); *Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1428-29 (5th Cir. 1996) (en banc).

SIGNED this 10th day of March, 2023.

Zack Hawthorn
United States Magistrate Judge